Jeffrey Steven MARX, Appellant,

v.

The STATE of Texas.

No. 994–97.

Court of Criminal Appeals of Texas,
En Banc.

Feb. 3, 1999.

Christine Byrd Webb, Burnet, for appellant.

John Morgan Minton, Asst. Dist. Atty., Matthew Paul, State's Atty., Austin, for State.

## OPINION

MANSFIELD, J., delivered the opinion of the Court, in which McCORMICK, P.J., and MEYERS, PRICE, and KEASLER, JJ., joined.

At appellant's trial for aggravated sexual assault of a child, two child witnesses testified via two-way closed circuit television, outside appellant's physical presence and over his objection. We granted appellant's petition for discretionary review to determine whether the admission of the child witnesses' testimony violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article 38.071 of the Texas Code of Criminal Procedure.

### The Relevant Facts

In August 1994, a Burnet County grand jury indicted appellant on three counts of aggravated sexual assault of a child. See Tex. Penal Code § 22.021(a)(1)(B)(i) & (2)(B). The named victim in each count was a thirteen-year-old girl, B.J. In April 1995, shortly before the case went to trial in the 33 rd District Court of Burnet County, the State filed written motions in that court asking

that B.J. and another girl, six-year-old J.M., an alleged witness to the offenses, be allowed to testify via two-way closed circuit television, outside appellant's presence. The State argued in the motions that the two girls, "if forced to testify in the presence and sight of the defendant, would suffer serious emotional and physical distress." The State argued further that the girls' closed circuit television testimony would be admissible under the Sixth Amendment, as interpreted in *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), and Article 38.071.[1]

The District Court held a pretrial hearing on the State's motions, at which hearing four witnesses testified. Pat Fluitt, B.J.'s teacher at Burnet Middle School, testified that B.J. had "learning disabilities" and read at a six-year-old's level. She testified further that B.J. had been "dreading" the possibility of testifying in appellant's presence and had "cried a couple of times" about it in class. Fluitt also testified that B.J. was "quite fearful" and that requiring her to testify in appellant's presence "would be a traumatic situation" for her.

Barney Raines, B.J.'s grandfather, testified that B.J. was "sixty percent" mentally retarded. He also testified that she had "shown fear" and had told him that appellant had threatened her. Raines testified further that he believed B.J. would suffer emotionally and perhaps physically if required to testify in appellant's presence.

Crystal Hayden, J.M.'s mother, testified that J.M. was afraid of appellant but was nevertheless ready to testify in his presence. Hayden also testified, however, that J.M. was "real scared" and that she would probably be traumatized if required to testify in appellant's presence, even if her testimony related only to what appellant had done to B.J.

Finally, Dr. Anita Calvert, a licensed mental health therapist, testified that she had been counseling J.M. for an extended period of time because of appellant's many sexual assaults on her. Calvert testified further that J.M. was a "wreck," that she had had nightmares, and that she had suffered serious psychological damage, all because of what appellant had done to her. Calvert also testified that J.M. had demonstrated "extreme sexual knowledge" and had "inappropriately advanced males in [Calvert's] office," again because of what appellant had done to her. Finally, Calvert testified that, although J.M. was "a very strong little girl" and "would probably testify okay" in appellant's presence, she could not be certain of that.

Appellant objected to the use of closed circuit television testimony on both constitutional and statutory grounds. He argued first that use of such testimony would deny him his Sixth Amendment right to confront the witnesses against him. He argued second that use of such testimony would violate Article 38.071 "because [that statute] applies only to a victim of the offense for which the defendant is on trial, and the victim of that offense [must be] under [thirteen] years of age." Appellant pointed out that B.J. was thirteen years old and that J.M. was not the alleged victim of the offense for which he was being tried.

At the conclusion of the hearing, the District Court found, as a matter of fact, that both B.J. and J.M. "would be traumatized by being required to testify in the defendant's presence" and that "the emotional distress ... would be more than a minimum." The court then rejected appellant's legal arguments without explanation and granted the State's motions for closed circuit testimony.

Shortly before B.J. and J.M. testified at the guilt/innocence stage of trial, appellant reiterated his previous objections to the use of closed circuit testimony and also argued, for the first time, that use of such testimony would impair his Fourteenth Amendment right to the presumption of innocence "because for a child to be presumed to be harmed [by testifying in his presence], then [one must] presume that this offense did, in fact, occur." The District Court rejected all of appellant's arguments, however, and, shortly thereafter, instructed the jury as follows:

---

1. Article 38.071 provides that, in certain specified circumstances, a child witness' testimony may be taken via videotape or closed circuit television, outside the defendant's presence. *See* generally 3 F. Maloney (ed.), *et al., Texas Criminal Practice Guide* § 73B.02[5][d] (1997).

Ladies and gentlemen, I'm going to give you an instruction at this time. Our statutes provide that the testimony of children in these types of cases can be taken by what we call closed circuit television, and that is what's going to be taking place here for the next couple of witnesses. So we'll be seeing the witness on the closed circuit television, and [the attorneys] will be asking the witness questions from the podium there so that [the witness] can see the person who is asking the questions, and so forth. The rest of the procedure will go according to the Code of Criminal Procedure as we are bound by it, at any rate, and that will be the only change insofar as the testimony is concerned.

B.J. and J.M. then testified via two-way closed circuit television. The jury later convicted appellant of one count of aggravated sexual assault and assessed his punishment at imprisonment for 23 years.

On appeal, appellant reiterated the constitutional and statutory arguments discussed previously. The Third Court of Appeals, in a rather elaborate analysis, considered and rejected all of appellant's arguments and affirmed the District Court's judgment. *Marx v. State,* 953 S.W.2d 321 (Tex.App.—Austin 1997). We granted appellant's petition for discretionary review to determine whether the Court of Appeals had erred. See Tex. R.App. Proc. 66.3(b) & (e).

### The Right to Confrontation

We turn first to appellant's argument under the Sixth Amendment. That amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This right to confrontation was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

▮ "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 110 S.Ct. at 3163. The Confrontation Clause reflects a preference for face-to-face confrontation at trial, but that preference must occasionally give way to considerations of public policy and the necessities of the case. *Id.* at 3165. Still, a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial *only* when denial of such confrontation is necessary to further an important public policy and the reliability of the testimony is otherwise assured. *Id.* at 3166. In particular, "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." *Id.* at 3169. The requisite *necessity* to justify the use of such a special testimonial procedure in a child abuse case may be shown if the trial court determines that use of the procedure is necessary to prevent significant emotional trauma to the child witness caused by the defendant's presence. *Ibid.* The requisite *reliability* of the child witness' testimony may be assured absent a face-to-face encounter through the combined effect of the witness' testimony under oath (or other admonishment, appropriate to the child's age and maturity, to testify truthfully), subject to cross-examination, and the factfinder's ability to observe the witness' demeanor, even if only on a video monitor. *Id.* at 3170. See *Lively v. State,* 968 S.W.2d 363, 366–367 (Tex.Crim. App.1998); *Hightower v. State,* 822 S.W.2d 48, 51 (Tex.Crim.App.1991); *Gonzales v. State,* 818 S.W.2d 756, 760–762 (Tex.Crim. App.1991).

▮ Applying these settled principles to the case at bar, we discern no Sixth Amendment violation in the District Court's admission of the two-way closed circuit television testimony of B.J. and J.M. The District Court explicitly found, as a matter of fact, that the special procedure was necessary to protect both B.J. and J.M. from the significant emotional trauma of having to testify in appellant's physical presence, and the record evidence, discussed previously, reasonably

supports that fact-finding.[2] See *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). Furthermore, the requisite reliability of the children's testimony was assured because they testified after promising to do so truthfully, they were subject to cross-examination, and the jury was able to observe their demeanor.

### The Presumption of Innocence

We turn next to appellant's argument under the Fourteenth Amendment. Appellant claims that the admission of the closed circuit television testimony impaired his presumption of innocence. Specifically, appellant argues that "[t]he only reasonable inference that the finder of fact can draw from the [trial] court allowing a witness to testify in this manner, is that the person on trial has abused the witness to such a degree, that to allow the witness to testify in the ordinary manner, would traumatize the witness even further."

The Fourteenth Amendment provides, in relevant part, that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." The right to due process of law includes within it the right to a fair trial, and basic to a fair trial is the presumption of the defendant's innocence. *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986); *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976); *Homan v. State*, 662 S.W.2d 372, 374 (Tex.Crim.App.1984) .

To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt.

The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of

deleterious effects on fundamental rights calls for close judicial scrutiny. Courts must do the best they can to evaluate the likely effects of a particular practice, based on reason, principle, and common human experience.

*Estelle v. Williams*, 96 S.Ct. at 1693 (citations omitted).

■ If a particular practice tends to brand the defendant with an unmistakable mark of guilt, it impairs the presumption of innocence and violates the Fourteenth Amendment's guarantee of due process of law, unless it furthers an essential state interest. *Holbrook v. Flynn*, 106 S.Ct. at 1347. If, on the other hand, the challenged practice need not be interpreted by jurors as a sign that the defendant is particularly dangerous or culpable, it is not inherently prejudicial and does not deny due process.

■ Based on "reason, principle, and common human experience," we discern no due process violation in the District Court's admission of the closed circuit testimony of B.J. and J.M. Before B.J. and J.M. testified, the District Court carefully instructed the jury that the closed circuit television procedure about to be employed was authorized by statute "in these types of cases." As the Court of Appeals noted, that instruction likely conveyed to the jury the state's general desire to protect children from the intimidating courtroom environment rather than implying that the procedure was necessary because of the defendant's guilt. See *Marx v. State*, 953 S.W.2d at 332. Even in the absence of such an instruction, the use of a closed circuit television procedure "would probably be viewed by the jury as suggesting that the witness was fearful of testifying in the courtroom setting rather than fearful of testifying while looking at the defendant." W. LaFave & J. Israel, *Criminal Procedure* § 24.3 at 1015 (2 nd ed.1992). Thus, we do not think it likely that the use of the closed circuit television procedure had a subconscious effect on the jury's attitude toward

---

2. We concede that the District Court's fact-finding with respect to J.M. is weakly supported by the record evidence, but we cannot say that that fact-finding is actually outside the zone of reasonable disagreement. In other words, we can-

not say that the District Court clearly abused its discretion in finding that J.M. would suffer significant emotional trauma if required to testify in appellant's presence.

appellant. In other words, we do not believe that the challenged practice tended to brand appellant with an unmistakable mark of guilt.

## Article 38.071

We turn finally to appellant's argument under Article 38.071.[3] As we noted before, appellant argues that the admission of the closed circuit television testimony of B.J. and J.M. violated Article 38.071 because that statute authorizes special testimonial procedures only for victims who are twelve years of age or younger. B.J. was thirteen years old at the time of the offense and at the time of trial, and J.M., although only six years old, was not the victim of the offense for which appellant was on trial.

Article 38.071, § 1, provides, in relevant part:

> This article applies only to a proceeding in the prosecution of [certain specified sex and assaultive offenses, including aggravated sexual assault of a child] if the offense is alleged to have been committed against a child 12 years of age or younger and if the trial court finds that the child is unavailable to testify at the trial of the offense, and applies only to the statements or testimony of that child.

We must determine whether that statutory language prohibits the use of closed circuit television testimony in circumstances not enumerated in the statute.

 When we interpret statutes, we necessarily focus our attention on the literal text of the statute in question. *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim.App. 1991). If the meaning of the statutory text, when read using the established canons of construction relating to such text, should have been plain to the legislators who voted on it, we give effect to that plain meaning, unless doing so would lead to absurd consequences that the legislators could not *possibly* have intended. *Ibid.*

 Section one of Article 38.071 states that the article applies "only" to the statements or testimony of a witness if certain circumstances, specified in section one, exist.

That is, the article, read literally, does not apply to the testimony of a witness in circumstances not specified in section one, nor does the article, read literally, prohibit the use of special testimonial procedures in circumstances not specified in section one. Would it, then, lead to absurd consequences that the legislators could not possibly have intended if we were to give effect to the plain meaning of the statute? We do not believe so. That this statute does not cover all the circumstances that it might have covered cannot reasonably be deemed an absurd result that the legislators could not possibly have intended. Indeed, it is quite possible that the intent of the legislators who voted for Article 38.071 was simply to enact a narrow statute that would both facilitate the prosecution of certain serious child abuse cases *and* survive an inevitable Confrontation Clause challenge. We also think it likely that those legislators would have made their intent clear if they actually intended to prohibit, except under the enumerated circumstances, special testimonial procedures that, like the one used in this case, *are constitutional.* In short, we agree with the concurring opinion of Judge Benavides, joined by Judges Campbell and Overstreet, in *Gonzales v. State,* 818 S.W.2d 756:

> If the legislature had elsewhere clearly expressed a policy that no courtroom testimony should be allowed except in the physical presence of the defendant, I might be inclined to think that Article 38.071 was meant as a list of specific exceptions to that general rule. But, in this instance, the general rule is expressed only in the Constitution, and the legislature has no authority to make exceptions. It follows that Article 38.071 cannot seriously be taken as an attempt by the legislature to prohibit the use of closed-circuit television [testimony] except under the enumerated circumstances. If that were the case, one might have expected it to say so explicitly, rather than to list exceptions against an unarticulated policy. And, although Article 38.071 might actually have been intended to limit the Constitution, it clearly cannot be effective to such end.

---

**3.** See footnote one, *supra.*

Consequently, the only permissible interpretation of the statute, no matter how counterintuitive, is that it prescribes a specific alternative testimonial procedure under certain defined circumstances, leaving the courts free to develop different procedures under other circumstances, constrained only by constitutional prohibitions.

*Id.* at 768. We hold, therefore, that Article 38.071 did not prohibit the admission of the closed circuit television testimony of B.J. and J.M.

We affirm the judgment of the Court of Appeals.

KELLER, J., filed a dissenting opinion.

HOLLAND, J., filed a concurring and dissenting opinion, in which WOMACK and JOHNSON, JJ., joined.

HOLLAND, J., filed a concurring and dissenting opinion in which WOMACK and JOHNSON, J.J., joined.

I agree with the majority that Article 38.071 of the Code of Criminal Procedure is not the exclusive authority permitting the use of closed-circuit television for the testimony of a child in Texas. *See Gonzales v. State,* 818 S.W.2d 756, 764 (Tex.Crim.App. 1991) (adopting the Supreme Court's analysis in *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) as basis for determining whether a defendant's state constitutional rights to confrontation have been violated by a child-witness closed-circuit testimony). I also agree with the majority that permitting B.J., the thirteen-year-old child victim, to testify via closed-circuit television was permissible under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *See Maryland v. Craig, supra.* I cannot agree with the majority, however, that the evidence supports the district court's decision to permit J.M., a six-year-old witness, to testify via closed-circuit television. *Lively v. State,* 968 S.W.2d 363 (Tex.Crim. App.1998); *Hightower v. State,* 822 S.W.2d 48 (Tex.Crim.App.1991);*Gonzales v. State, supra.* I would hold permitting J.M. to testify via this exceptional procedure violated ap-

pellant's rights under the Confrontation Clause of the Sixth Amendment.

Appellant was indicted on three counts of aggravated sexual assault of B.J. Before trial, the State filed a written motion asking that B.J. and J.M. be allowed to testify via two-way closed-circuit television. The State argued in the motions that the two girls, "if forced to testify in the presence and sight of the defendant, would suffer serious emotional and physical distress." The State argued, *inter alia,* that the girls' closed-circuit television testimony was admissible under *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The District Court held a pretrial hearing on the State's motion. After hearing testimony, the district court found, as a matter of fact, that both B.J and J.M. "would be traumatized by being required to testify in the defendant's presence" and that "the emotional distress ... would be more than a minimum."

The majority holds the record evidence "reasonably supports" the trial court's decision. In a footnote, the majority concedes that the district court's fact-finding with respect to J.M. is "weakly supported by the record evidence" but refuses to find the trial court "abused its discretion in finding that J.M. would suffer significant emotional trauma if required to testify in appellant's presence" because its decision was not "outside the zone of reasonable disagreement." *Marx,* at n. 2. According to this Court's recent decision in *Guzman,* almost total deference must be given to the trial court's determination because the State's motion for closed-circuit testimony of J.M. concerns mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim.App.1997). Viewing the evidence in the light most favorable to the trial court's ruling, I believe the record evidence indicates that J.M. would not suffer further significant emotional trauma if required to testify in appellant's presence regarding her observations of appellant and B.J. Because the majority fails to give a complete account of the testimony presented at the pre-trial hearing, a recitation of the relevant testimony is necessary.

The State's evidence regarding J.M. was based on the testimony of her mother, Crystal Hayden, and Dr. Anita Calvert. Though the testimony of J.M.'s mother on direct examination by the State established that J.M. had suffered emotional harm due to prior sexual offenses allegedly committed by appellant and was frightened of him, Hayden did not indicate that testifying in open court would cause J.M. additional emotional trauma.

Q. Has she shown you any fear or trauma—

A. Yes.

Q. —concerning her testifying?

A. Some.

Q. What has she shown to you?

A. Being scared of him, Jeffrey Marx. But she's ready for it. She said she wanted to come.

Q. Okay. Now, do you feel like if she testifies—Based on your conversations with her and your knowledge of her, do you feel like if she testifies in open court in the same seat that you're sitting in the presence and in sight of Jeffrey Steven Marx, the defendant in this case, would cause any undue physical or psychological or emotional distress to her?

A. It would be better if she was not in the same presence as him, I think ...

Q. Would you explain to the Court the symptoms that you have indicated or that you have seen her express about Jeffrey Marx and her testifying in court?

A. She has nightmares. She don't sleep in her bed.... She's scared to go to the bathroom and she wets the bed. She's real scared.

Q. Do you feel like this would cause more emotional—

A. Yes, I do.

Q. —and psychological trauma if she testifies in the presence of Jeffrey?

A. Yes, I do.

After this line of questioning, Hayden was made aware on cross-examination that J.M.'s testimony would not relate to the incidents between her and appellant, but to the incidents she witnessed between appellant and B.J. Once Hayden realized that J.M. would not be testifying in appellant's presence regarding what he had done to her, Hayden retracted her previous testimony and indicated that J.M. "was ready for that."

Q. Do you understand we're talking about testifying just in the case that she's a witness in, not in the case in which she was allegedly abused in? Do you understand that?

A. Yes.

Q. Okay. And you understand all she's going to be asked to testify to in this proceeding is what she allegedly saw through some window?

A. Okay.

Q. Okay. You understand the difference now?

A. Okay. Well, that does make a difference.

Q. Well, sure. All she's going to be asked to testify to is what she—

A. Okay. So this isn't her case?

Q. No.

A. Okay.

Q. It's Bebe's case.

A. Okay. Well, that she's okay with. I mean, she's ready for that.

Q. I mean, what she saw hasn't caused her any kind of emotional distress or problems, what she allegedly saw through a window?

A. No. She just—I mean, she could probably do it.

Hayden further testified, in response to questioning by the trial court, that the emotional trauma J.M. had suffered occurred prior to J.M. knowing that she would be testifying against appellant. She did not testify that J.M. suffered emotional trauma because she feared testifying as a witness in this case.

THE COURT: ... Prior to her being called as a witness in this case, did she have any of those kind of problems like nightmares, wetting the bed, so forth?

THE WITNESS: *Could you rephrase that question, please?*

THE COURT: You know that your daughter has been called as a witness?

THE WITNESS: Yes, I do.

THE COURT: Before she was called to be a witness in this case, did she have any of those kind of nightmares?

THE WITNESS: Yes.

THE COURT: What caused those then?

THE WITNESS: I don't know.

THE COURT: So what you're telling me then is she's had nightmares all along, even before this happened?

THE WITNESS: Before we found out it happened because it could have happened a long time ago.

Dr. Calvert testified that though J.M. had in fact suffered emotional trauma due to the prior incidents with appellant, she did not believe testifying in appellant's presence would result in further damage.

Q. ... Doctor, do you feel like if she testifies in open court in the presence of Jeffrey Steven Marx, that she will—the result would cause further serious emotional and physical distress than what she has now?

A. If no one was ugly to her, you know, made her feel really badly about it—I think Jennifer is more of a talker than most. She will probably come on and do it.

Q. Of course, we can make her do that as you well know, but my concern is what would be the emotional and physical distress that would cause—that would be resulting from her testifying in open court in the presence of another.

A. In the presence of Jeffrey?

Q. Yes, ma'am.

A. She tells me she wants to. So unless she gets more frightened then I expect, that little girl would probably testify okay.

When questioned by the trial court, Dr. Calvert reiterated her prior opinion that testifying as a witness to the offense charged would not cause J.M. further emotional trauma.

THE COURT: Do you feel like there would be any emotional or physical trauma if she were to be in confrontation with the defendant in the ordinary involvement in the courtroom trial?

THE WITNESS: You mean if she had to go and interact with him or is she just -

THE COURT: If she had to sit there and testify from the witness stand.

THE WITNESS: I can't say for sure, but she says she wants to tell what happened, she's a very strong little girl, strong-willed child like that.

THE COURT: Do you think she would suffer any emotional or physical problems as a result of that confrontation?

THE WITNESS: I couldn't guarantee it, but I think—occasionally there's a child who wants to tell their story.

THE COURT: Listen to my question.

THE WITNESS: Okay.

THE COURT: Do you think that there would be any emotional or physical problems with her confronting—testifying from that witness stand and having to confront her uncle?

THE WITNESS: Your Honor, I couldn't say for sure that there would not be. I wouldn't expect it.

On redirect by the State, Dr. Calvert explained not having to testify in appellant's present would be easier on J.M. but did not indicate to do so would traumatize her.

Q. Dr. Calvert, if [J.M.] were to be able to tell her story but not in the physical presence of [the defendant], via closed circuit television, do you feel like there would be less trauma, or you could be more assured of less trauma for her to tell her story in that manner than she would if she had to face in the same courtroom [the defendant]?

A. She would probably tell it better if she didn't have to look at him, of course.

* * *

Q. Do you feel like she would suffer—you said a while ago that you weren't sure. Do you feel like there would be a less chance of her—or would you be more assured that she would not suffer any serious or emotional or physical distress if she testifies via closed circuit television and not in the presence or the sight of [the defendant]?

A. Obviously there would be less risk if there was going to be any trauma to her, yes.

In viewing the evidence in the light most favorable to the district court's ruling, I cannot agree with the majority that the record evidence "reasonably supports" the district court's determination that the closed-circuit procedure was necessary to protect J.M. from further emotional trauma. In holding the trial court's decision was not outside the zone of reasonable disagreement, the majority ignores Hayden's subsequent clarification that her daughter would suffer further trauma only if forced to testify in appellant's presence regarding what appellant did to her, not what she observed him do to B.J. This clarification cannot be reasonably separated from Hayden's prior testimony. Also, the majority relies on Dr. Calvert's testimony regarding the extent of emotional trauma J.M. has suffered as a result of appellant's abuse. This evidence, however, does not show that the use of this special procedure was necessary to protect J.M. from further emotional trauma as mandated by the Supreme Court in *Maryland v. Craig*.

Because I find the trial court's decision to allow J.M. to testify via closed-circuit television was an abuse of discretion, I respectfully dissent. Instead, I would hold the trial court violated appellant's right to confrontation under the Sixth Amendment in permitting J.M. to testify via closed-circuit television.

KELLER, J., delivered a dissenting opinion.

Appellant sought review of the Court of Appeals holdings affirming the trial court's televising, via closed-circuit equipment, of the testimonies of two girls—B.J., the thirteen-year-old child victim, and J.M., a six-year-old child witness. Appellant alleged that this procedure violated Texas Code of Criminal Procedure, Article 38.071, the Confrontation Clause of the Sixth Amendment, and the Due Process Clause of the Fourteenth Amendment. The majority affirms, finding that the statute is not the exclusive authorization for the closed-circuit procedure and that there is no violation of the United States Constitution. I agree with the majority's assessment that Article 38.071 does not preclude the procedure employed in the present case but I do so for reasons different from those articulated in the lead opinion. And I agree with the majority that using the closed-circuit procedure was constitutionally permissible for B.J.'s testimony. I disagree with the majority, however, regarding the testimony of J.M. Use of the closed-circuit procedure for her testimony violated the Confrontation Clause.

## I. ARTICLE 38.071

Article 38.071 applies only to the testimony of child victims twelve years of age or younger:

This article applies only to a proceeding in the prosecution of an offense defined by any of the following sections of the Penal Code if the offense is alleged to have been committed against a child 12 years of age or younger....

Article 38.071 § 1 (ellipsis inserted). Hence, the statute could not authorize the use of closed-circuit televised proceedings for either B.J. or J.M. because B.J. was older than twelve and J.M. was not the victim.

The question in the present case is whether Article 38.071 constitutes the *exclusive* procedure for using closed-circuit televised testimony. If it does, then the closed-circuit procedure for both B.J. and J.M. was improper as a matter of state law because the requirements of the statute were not met. The starting point in any question of statutory construction is the text of the statute itself. When a statute is clear and unambiguous, we apply the plain meaning of its words. *Boykin v. State*, 818 S.W.2d 782, 785–786 & 786 n. 4 (Tex.Crim.App.1991). We examine extratextual factors only when the words of the statute are ambiguous or

the plain meaning would lead to absurd results. *Id.* In determining plain meaning, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and usage." TEX. GOV'T CODE § 311.011(a); *Dowthitt v. State,* 931 S.W.2d 244, 258 (Tex.Crim.App.1996). In addition, we presume that "the entire statute is intended to be effective." TEX. GOV'T CODE § 311.021(2); *Dowthitt,* 931 S.W.2d at 258. "Every word in a statute has been used for a purpose and each word, phrase, clause, and sentence should be given effect if reasonably possible." *Dowthitt,* 931 S.W.2d at 258; *Morter v. State,* 551 S.W.2d 715, 718 (Tex. Crim.App.1977), quoting *Eddins–Walcher Butane Co. v. Calvert,* 156 Tex. 587, 591, 298 S.W.2d 93, 96 (1957).

Read literally, the statute simply does not apply when the child is older than twelve or not the victim, and therefore, the statute cannot limit the State's ability to procure testimony by such persons. The majority resolves the statutory challenge by holding exactly that: that the statute does not apply to non-victims or to children older than twelve. However, it appears to me that the plain language of the statute would lead to absurd results. If trial courts have the power to provide a closed-circuit procedure apart from the statute and are not bound by the statute's requirements, then that portion of the statute has no impact in this state; nothing would change if the closed-circuit provision did not exist. Showing, however, that the plain meaning of a statute leads to absurd results does not end the inquiry. Extratextual sources may show that the result is not absurd, after all, or that the Legislature intended the plain meaning despite the

absurd result. Hence, an examination of extratextual sources is required.

The Legislature has given some guidance as to the factors we may examine in construing the statute. We may consider, among other matters, the

(1) object sought to be attained;

(2) circumstances under which the statute was enacted;

(3) legislative history;

(4) common law or former statutory provisions, including laws on the same or similar subjects;

(5) consequences of a particular construction;

(6) administrative construction of the statute; and

(7) title (caption), preamble, and emergency provision.

Tex. Gov't.Code, § 311.023; *Ramos v. State,* 934 S.W.2d 358, 364 (Tex.Crim.App.1996).[1]

The legislative history and the circumstances under which the statute was enacted reveal some clues to its interpretation. Article 38.071 was passed in 1983, long before the advent of the Supreme Court's decision in *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Hence, the Legislature did not, through the statute, attempt to codify Supreme Court precedent as no such precedent yet existed.[2] The Legislature was, however, concerned about the Confrontation Clause. On the Senate Floor, Senator Parmer, the sponsor of the bill, stated that the proposed law "very narrowly draws the lines and limits for the introduction of such testimony to make sure that we don't offend the constitutional provisions for confrontation and cross-examination." Senate Floor, SB 836, May 17, 1983.[3] This

---

**1.** This provision is part of the "Code Construction Act," which applies to the Code of Criminal Procedure, at least to the extent it has been amended or reenacted by the 60th or subsequent legislature. Tex. Gov't Code § 311.002(2); *Ramos,* 934 S.W.2d at 364, n. 8; *Postell v. State,* 693 S.W.2d 462, 464 (Tex.Crim.App.1985); *Barbee v. State,* 432 S.W.2d 78, 82 (Tex.Crim.App. 1968), *cert. denied,* 395 U.S. 924, 89 S.Ct. 1779, 23 L.Ed.2d 241 (1969).

**2.** An example in which the Legislature did codify Supreme Court precedent is Texas Code of Criminal Procedure, Article 37.071 § 2(e), which codi-

fied *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

**3.** In 1987, the scope of offenses was narrowed from any offense to a list of specified offenses, and a requirement that the child be "unavailable" was added. A number of substantial revisions in other portions of the statute were also made. In addition, the 1987 law contained a "purpose" statement, with even stronger language concerning the intent to conform to the Confrontation Clause. But, that purpose statement carries little, if any, weight on the issue at hand because the changes in the statute do not

statement could be interpreted as supporting appellant's position, but other legislative statements and circumstances undercut such an interpretation.

The statute was also enacted before the adoption of the Rules of Criminal Evidence, which were adopted in 1985 and made effective in 1986. During public hearings at the Senate Committee on Jurisprudence, Steve Chaney, then chief of the trial section at the Tarrant County District Attorney's Office, testified that the proposed bill would render admissible at trial videotape evidence that grand juries were already permitted to see. Transcript, Senate Committee on Jurisprudence, SB 836, April 19, 1983, p. 6. He stated that the evidence was not admissible at trial because it was hearsay. Transcript, p. 8. On the Senate Floor, before final passage, Senator Parmer echoed that the testimony was, at the time, "available to the grand jury but not available to the trial jury." Senate Floor, SB 836, May 17, 1983. The bill, and later the statute as enacted, contained provisions regarding the admissibility of prerecorded videotaped testimony as well as provisions for televised live testimony via closed circuit equipment. Senator Parmer referred to both types of testimony as "videotaped" testimony and made no other attempt to distinguish the two. Senate Floor, SB 836, May 17, 1983. At the time Article 38.071 was originally enacted, hearsay was a common-law rule, the precise contours of which were uncertain. *See* 24 Tex. Jur.2d *Evidence* §§ 557 and 561.

What can be divined from the circumstances and legislative history is that the Legislature was apparently attempting to create hearsay exceptions that would pass muster under the Confrontation Clause without any real guidance concerning the scope of the hearsay rule or of the Confrontation Clause. The Legislature may have believed that the hearsay rule would bar live closed-circuit testimony as well as prerecorded videotaped testimony. Such a belief would have been erroneous because live closed-cir-

cuit testimony is not "out of court" testimony, but such a belief would explain the inclusion of the closed-circuit provision in the statute. Or, the Legislature may have originally drafted the statute to create a hearsay exception just for videotaped testimony, later adding on the closed-circuit testimony provision without contemplating the difference in nature of the two types of testimony.

What is clear from the legislative history, and what is to me dispositive of this aspect of the problem, is that the Legislature intended to *expand* (rather than restrict) the admissibility of evidence in passing Article 38.071. Therefore, if the courts otherwise have the power to authorize closed-circuit procedures, the Legislature did not intend, in passing Article 38.071, to limit that power.

The question then becomes, do courts have the power, apart from statute, to authorize the use of televised, closed-circuit procedures. The answer is yes. We have recognized that the courts have inherent power over "the everyday administration of justice." *Matchett v. State*, 941 S.W.2d 922, 932 (Tex. Crim.App.1996), *cert. denied*, 521 U.S. 1107, 117 S.Ct. 2487, 138 L.Ed.2d 994. Moreover, the Legislature has directed that the courts "control proceedings so that justice is done." Tex. Gov't Code § 21.001(b). Hence, absent a constitutional provision, statute, or rule to the contrary, the trial court has the power to control the procedural aspects of a case. One of those procedural aspects is the manner in which witnesses will be required to testify. Therefore Article 38.071 does not bar the procedures employed in the present case.

## II. CONFRONTATION

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This right to confrontation was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Pointer v.*

appear to be material to the question of whether the statute is the exclusive method through which closed-circuit procedures may be conducted. "[O]ne session of the legislature does not have the power to declare the intent of a past

session, and a legislative construction of an act of another legislature is uniformly held to be entitled to little weight." *Ex parte Schroeter*, 958 S.W.2d 811, 813 (Tex.Crim.App.1997).

*Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before a trier of fact." *Craig,* 497 U.S. at 845, 110 S.Ct. 3157. The Confrontation Clause reflects a preference for face-to-face confrontation at trial, but that preference must occasionally give way to considerations of public policy and the necessities of the case. *Id.* at 849, 110 S.Ct. 3157. In *Craig,* the Supreme Court recognized that the state had an interest in protecting the psychological well-being of child abuse victims which interest may, in the proper case, justify denying face-to-face confrontation. *Id.* at 853, 110 S.Ct. 3157.

The Confrontation Clause issue presented by this case has two parts: (1) what level of emotional harm must the State show that a child will suffer in order to justify depriving a defendant of his right to a face-to-face confrontation, and (2) is there sufficient evidence in the record to support a conclusion that the child would suffer the requisite level of emotional harm?

## A. Degree of emotional harm required

The level of emotional harm required to justify dispensing with face-to-face confrontation is a question of law. I so conclude because the trial court "is not in an appreciably better position to decide the issue," *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997)(quoting *Villarreal v. State,* 935 S.W.2d 134, 139 (McCormick, P.J. concurring)), and because this is an issue where uniformity of application is important, *see Villarreal,* 935 S.W.2d at 148 (Keller, J. concurring). Moreover, the Supreme Court cast the issue as one of law by indicating that it had the authority to decide the level of emotional trauma required to justify avoiding

a face-to-face confrontation. *Craig,* 497 U.S. at 856, 110 S.Ct. 3157.

The Supreme Court did "not decide the minimum showing of emotional trauma" for using a televised, closed-circuit procedure. *Id.* The Court simply held that "mere nervousness or some reluctance to testify" (a mere *de minimis* showing) fell below the minimum showing and that "serious emotional distress such that the child cannot reasonably communicate" clearly met constitutional requirements. *Id.; see also Gonzales v. State,* 818 S.W.2d 756, 762 n. 10 (Tex.Crim.App.1991)(acknowledging that the Supreme Court "was not willing to decide what would suffice to meet this 'more than *de minimis* standard'"). The question left open is, how much harm must be shown? Is the minimum threshold of emotional distress one that just *barely* exceeds "mere nervousness or reluctance to testify?" Or is something more required? I believe more is required. "That the face-to-face confrontation requirement is not absolute does not, of course, mean that it may easily be dispensed with." *Id.* at 850. Therefore, I would hold that, to pass muster under the Confrontation Clause, the State must show that the child witness would suffer more trauma than a victim of a serious, violent crime would ordinarily feel when facing the perpetrator in court. Any other standard would permit the State to avoid the requirements of the Confrontation Clause as a matter of course. While child victims more often need special protection, denying face-to-face confrontation should still be the exception rather than the rule.[4]

## B. Degree of emotional harm shown

Next, I turn to the second inquiry: is there sufficient evidence to show the requisite degree of harm? This issue is obviously a fact question that requires "almost total deference" to the trial court's findings. *See Guzman,* 955 S.W.2d at 89. Giving almost

---

4. Justice Scalia, joined by Justice Thomas, has recently cautioned that the *Craig* exception to face-to-face confrontation "is a narrow one":

> It is a dangerous business to water down the confrontation right so dramatically merely because society finds the charged crime particularly reprehensible. Indeed, the more reprehensible the charge, the more the defendant is in need of all constitutionally guaranteed protection for his defense.

*Danner v. Kentucky,* —— U.S. ——, 119 S.Ct. 529, 530, 142 L.Ed.2d 439 (1998)(Scalia, J. dissenting from refusal to grant certiorari).

total deference means viewing the evidence in the record "in the light most favorable to the trial court's ruling." *Id.* I now examine the record to determine whether the evidence was sufficient to justify avoiding face-to-face confrontation of B.J. and J.M.

### 1. *B.J.'s testimony*

Employing closed-circuit procedures for B.J. does not violate the Confrontation Clause. The record shows that B.J. had learning disabilities and read at a six-year-old's level. The record also shows that B.J. was very fearful of testifying before appellant, and that such testimony would be traumatic for her. In fact, a teacher testified that "when it's mentioned she [B.J.] may have to face him [appellant] face to face, she keeps saying 'I can't'" (bracketed material inserted). The testimony showed that B.J. cried about the possibility of facing appellant, and there was even evidence that B.J. might suffer physically if she testified. Given evidence of B.J.'s low intellectual functioning for her age, the high level of fear she showed about facing appellant, and other testimony about the harm she would suffer, I agree with the Court of Appeals' holding that the trial court was within its discretion in conducting the special procedure for her testimony. The record supports a finding that testifying would cause B.J. to suffer more trauma than would ordinarily be suffered by the victim of a serious, violent crime when facing the perpetrator in court.

### 2. *J.M.'s testimony*

But J.M.'s testimony is another matter entirely. The State's evidence concerning J.M. falls primarily in four categories: (1) emotional harm J.M. has suffered as a result of the crime, (2) J.M.'s fear of appellant, (3) the harm J.M. would suffer if she testified, and (4) evidence that it would be better if J.M. testified via the closed-circuit method.

J.M.'s mother testified that J.M. had nightmares and could not sleep in her bed. Further, the mother testified that J.M was scared to go to the bathroom and she wet her bed. Although the State attempted, through its questioning, to link these effects to the upcoming testimony, the witness never pro-

vided such a link. In fact, questioning from the trial court established that these symptoms occurred even before the crime was discovered and well prior to the time that J.M. was informed that she would be testifying. Dr. Anita Calvert also testified that J.M. suffered serious emotional damage as a result of the crime. She further testified that J.M. was "a wreck," that she had problems with trusting people, and that she engaged in sexually inappropriate behavior. Dr. Calvert never testified, however, that any of these symptoms were linked to J.M.'s anticipated testifying; rather, Dr. Calvert testified specifically that the symptoms were attributable to the assaults committed against J.M.

J.M.'s mother also testified that J.M. was scared of appellant but wanted to testify in court:

Q. What has she shown to you?

A. Being scared of him, Jeffrey Marx. But she's ready for it. She said she wanted to come.

. . . .

Q. And not telling me what she said, but based upon what she has said to you, does she show any sign of being afraid when she talks about what she saw?

A. Some.

Both J.M.'s mother and Dr. Calvert were questioned concerning the emotional harm that would be caused by testifying in appellant's presence. J.M.'s mother affirmed that J.M. would suffer "some harm" if she testified in appellant's presence because "she's scared of him." The mother further assented that testifying in appellant's presence "would cause more emotional and psychological trauma." During cross-examination, however, J.M.'s mother indicated that testifying as a mere witness, instead of as a victim, would pose much less of problem:

Q. And you understand all she's going to be asked to testify to in this proceeding is what she allegedly saw through some window?

A. Okay.

Q. Okay. You understand the difference now?

A. Okay. Well, that does make a difference.

Q. Well, sure. All she's going to be asked to testify to is what she—

A. Okay. So this isn't her case?

Q. No.

A. Okay.

Q. It's [B.J.'s] case.

A. Okay. Well, that she's okay with. I mean, she's ready for that.

Q. I mean what she saw hasn't caused her any kind of emotional distress or problems what she allegedly saw through a window?

A. No. She just—I mean, she could probably do it.

On redirect, J.M.'s mother stated that J.M.'s testifying in appellant's presence would "probably" traumatize her because "[s]he hasn't seen the man in almost a year."

Dr. Calvert stated that J.M. could testify in appellant's presence with little difficulty:

Q. Doctor, do you feel like if she testifies in open court in the presence of Jeffrey Steven Marx, that she will—the result would cause further serious emotional and physical distress than what she has now.

A. If no one was ugly to her, you know, made her feel really badly about it—I think [J.M.] is more of a talker than most. She will probably come on and do it.

Q. Of course, we can make her do that as you well know, but my concern is what would be the emotional and physical distress that would cause—that would be resulting from her testifying in open court in the presence of another.

A. In the presence of Jeffrey?

Q. Yes, ma'am.

A. She tells me she wants to. So unless she gets more frightened than I expect, that little girl would probably testify okay.

Dr. Calvert maintained this position in the face of questioning by the trial court:

Q. Do you feel like there would be any emotional or physical trauma if she were to be in confrontation with the defendant in the ordinary involvement in the courtroom trial?

A. You mean if she had to go and interact with him or if she just—

Q. If she had to sit there and testify from the witness stand.

A. I can't say for sure, but she says she wants to tell what happened, and she's a very strong little girl, strong-willed child like that.

Q. Do you think she would suffer any emotional or physical problems as a result of that confrontation?

A. I couldn't guarantee it, but I think—occasionally there's a child who wants to tell their story.

Q. Listen to my question.

A. Okay.

Q. Do you think that there would be any emotional or physical problems with her confronting—testifying from that witness stand and having to confront [appellant]?

A. Your Honor. I couldn't say for sure that there would not be. I wouldn't expect it.

Finally, there was testimony from J.M.'s mother and Dr. Calvert that it would be "better" if J.M. did not testify in appellant's presence. J.M.'s mother testified in the following exchange:

Q. Now, do you feel like if she testifies—Based on your conversations with her and your knowledge of her, do you feel like if she testifies in open court in the same seat that you're sitting, in the presence and in the sight of Jeffrey Steven Marx, the defendant in this case, would cause any undue physical or psychological or emotional distress to her?

A. It would be better if she was not in the same presence as him, I think.

Dr. Calvert also opined that it might be "better" if J.M. testified outside appellant's presence:

Q: Dr. Calvert, if [J.M.] were able to tell her story but not in the physical presence of Jeffrey Steven Marx, via closed-circuit television, do you feel like there would be less trauma, or you could be more assured of less trauma for her to tell her story in that manner than she would if she had to face in the same courtroom Jeffrey Marx?

A. She would probably tell it better if she didn't have to look at him, of course.

. . . .

Q. Do you feel like she would suffer—you said a while ago that you weren't sure. Do you feel like there would be a less chance of her—or would you be more assured that she would not suffer any serious or emotional or physical distress if she testifies via closed circuit television and not in the presence or the sight of Jeffrey Marx?

A. Obviously there would be less risk if there was going to be any trauma to her, yes.

Having viewed the four categories of evidence presented by the State, I conclude, even in the light most favorable to the trial court's ruling, that the evidence is insufficient to support a finding of the requisite degree of harm that would justify abrogating the accused's right to face-to-face confrontation. Category (1), the harm caused by the crime, is only tangentially related to the inquiry at hand. That a victim may have suffered serious emotional harm as a result of the crime does *not* prove that the victim will suffer additional serious emotional harm—greater than that ordinarily suffered by a victim of a serious, violent crime—from testifying in the perpetrator's presence. At most, it might provide a background in which to assess other evidence directly relevant to the issue. If evidence of emotional trauma resulting from the offense were sufficient to authorize closed-circuit testimony, such would be routinely justified.

Category (4), testimony that it would be "better" for the victim if she testified via closed-circuit television, provides little, if any support for a showing of the requisite degree of harm. That the victim might be "better off" emotionally or could better relate her story does not show that by testifying face-to-face she would suffer an emotional harm greater than that ordinarily suffered by a victim of a serious, violent crime testifying face-to-face. As Dr. Calvert testified, obviously, there would be less risk of trauma from closed-circuit testimony. But, again, if we were to hold that that fact authorized closed-circuit testimony, the procedure would be authorized in virtually every case.

That leaves categories (2) and (3), the victim's fear of the accused and evidence that testifying in the accused's presence would cause emotional harm. Category (2) is circumstantial evidence to support emotional harm from testifying while category (3) is direct evidence. None of the evidence fitting these two categories in the present case rises to the requisite degree of harm. At most, the State proved through the mother's testimony that J.M. would probably suffer some psychological harm if she testified in appellant's presence. But, the significance of J.M.'s mother's testimony was seriously undercut after she realized that J.M. would not be testifying on her own case. Moreover, the record is replete with undisputed evidence, from both J.M.'s mother and from Dr. Calvert, that J.M. wanted to testify and was ready to testify in appellant's presence. And, Dr. Calvert clearly and consistently testified that serious emotional harm from face-to-face testimony was unlikely.

Under these circumstances, even considering together all of the evidence in the light most favorable to the trial court's ruling, the record does not support a conclusion that J.M. would suffer more trauma than a victim of a serious, violent crime would ordinarily feel when facing the perpetrator in court. Hence, I would find that the trial court violated appellant's right of confrontation under the Sixth Amendment when it permitted J.M. to testify via closed-circuit television.

I would reverse the decision of the Court of Appeals and remand the cause to that court to conduct a harm analysis.