11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Freddy Antonio Ruiz
Aviles

Appellant

Vs.                   No.
11-01-00243-CR B Appeal from Dallas County

State of Texas

Appellee

                                                                                                

The jury
convicted Freddy Antonio Ruiz Aviles of the aggravated sexual assault of his
step-son, a child younger than 14 years. The jury assessed his punishment at
confinement for 40 years.  We affirm.

                                                                  Issues
Presented

Appellant
argues in his first issue that the evidence is not Afactually sufficient@ to support his conviction for aggravated
sexual assault.  Appellant argues in
Issue No. 2 (the federal claim) and in Issue No. 3 (the state claim) that the
trial court violated his constitutional rights to Aconfrontation@ by allowing the  complainant to
Atestify via closed circuit television.@ 
Appellant argues in Issue No. 4 (the federal claim) and in Issue No. 5
(the state claim) that the trial court=s decision to allow the child to Atestify via closed circuit television@ after the trial commenced violated his rights to Adue process@ and to Adue course of law@ because his lawyer was not given the
opportunity to voir dire the jury as to whether this procedure would Aerode the presumption of innocence.@ 
Appellant argues in his final issue that the trial court erred by Afailing to give a burden of proof instruction@ regarding the extraneous offense admitted
during the punishment phase.

                                                                    The
Evidence








Officer
Arleen Martinez of the Dallas Police Department testified about her
investigation of the complaint filed against appellant by the child=s grandmother.  Then Mark Club, a therapist at the Dallas Children=s Advocacy Center, testified about the
counseling which he provided for the child.  After that testimony, the reporter=s record shows that the jury was in the courtroom when the following
statement was made by the presiding judge:

THE COURT:
Members of the jury, you cannot see me, but we have reconvened in the Court=s chambers. 
The purpose of being in chambers is to do the testimony of the child
witness on closed-circuit television. 
You will be able to see and hear the witness.  You will be able to hear...the witness answer as you observe the
witness.

 

The
defense attorney is also present in the chambers, the Court=s office, with me, the State Attorney, and
the court reporter.  There is also a
camera operator present.

 

After that
explanation, the complainant testified on direct examination that he was born
on January 6, 1992.[1]  Relevant portions of his testimony on direct
examination by the prosecutor read as shown:

Q:  Did [appellant] touch you somewhere?

 

A: Yes, he
did, and he touched me on my private part. 
And I didn=t
like.  He did what he wasn=t supposed to do.

 

                                                           *    *   
*

 

Q: Did he
ever do anything to you with his private part?

 

A: I don=t want to talk about it.  Yes.

 

                                                           *    *   
*

 

Q: Did
[appellant] hurt you?

 

A: Yeah,
he hurt me.

 

                                                           *    *   
*

 

Q: What
part of your body was hurting?

 








A: My bottom

 

                                                           *    *   
*

 

Q: You know that
[appellant] wasn=t supposed to do that; right?

 

A: Yes.  That was wrong....Now, am I finished?

 

The next witness was the Aoutcry witness.@  Pamela Rogers Shepherd
testified that she worked for the United States Post Office; that she was 41
years old; that she was a widow; that she had three daughters; and that she had
two grandsons.  Shepherd testified that
she got legal custody of the two grandsons on December 23, 1999, and that they
went to a specialized school for children with Apsychological, emotional, and physical or school problems.@ 
Shepherd testified that she met appellant in February of 1997 and that
he married her oldest daughter.  

Shepherd also testified that, after the two grandsons came to live with
her, she noticed that the complainant Awould hunch over his stuffed animals@ and that he would Atouch himself@ and Ado things in the shower.@ 
Shepherd noticed that the complainant and his little brother Awould touch each other@ and would Atake their penis and rub it.@  Shepherd also testified that
the complainant Ahad a lot of nightmares@ and that he would wake up screaming.  On the night that she discovered what had
happened, Shepherd had separated the two boys and had talked to the complainant
by himself.  Shepherd testified that she
talked Ain a calm tone@ and that she Ahad to
pry to get the information.@  After she asked him four or
five times if anybody had ever done this to him, the complainant said: AYes.@  Shepherd said that the
complainant did not want to tell her because he was afraid that she would get
hurt or that his mom would get hurt. 
Shepherd said that she had to Akeep letting him know@ that it was okay to talk to her and that nobody was going to hurt her
or his mother, and then the complainant identified appellant.  Relevant portions of the Aoutcry@ testimony read as shown:

Q: Did [the complainant]
tell you what [appellant] did?

 

A: Yes.

 

Q: What did he tell you?

 








A: He said Freddy stuck
his penis in his mouth and permed in it. 
And he didn=t know
how to say Asperm.@

 

                                                           *    *   
*

 

Q: Tell us what the
graphics were, though.

 

A: He told me
that...Freddy would stick [his penis] in his back end and it hurt him so
bad.  And that=s when he started - - He would just get
welled up.  That=s when he would get very, very upset.

 

Shepherd
said that her grandson Asaid it happened a lot.@  It would happen at night when
appellant came in from work while they lived in the apartment on Surrey
Row.  Shepherd said that she immediately
called A9-1-1" and that they told her to call
the police station the next morning.  

The State=s
final witness was Dr. Donna Persaud. 
She teaches at Southwestern Medical School, and she is on the staff at
the children=s medical center at the REACH Clinic.  The acronym stands for Referral and Evaluation
of Abused CHildren.  Dr.
Persaud said that she has performed over 2,000 sexual assault exams and that
she examined the complainant in this case in February of 2000.  The child was referred to her by Officer
Arleen Martinez of the Dallas Police Department.  Dr. Persaud said that the child=s genitals were normal but that the anal exam revealed unusual findings
which are sometimes seen with Achronic trauma.@  Those findings Acould be consistent with past repeated
penetrating trauma.@ Dr.
Persaud agreed on cross-examination that she saw Ano fresh trauma to the anus@ and that she could not say Afor sure@ that the findings proved Apast trauma.@








After the
State closed, appellant called two witnesses who testified for him, and then
appellant took the stand as a witness. 
Appellant testified that he was 26 years old and that he came to Texas
from Managua, Nicaragua.  Appellant
testified that he had a Agreen card@ which
allowed him to work in the United States. 
Appellant testified that he was married in Nicaragua and that he and his
first wife separated in 1993 or 1994. 
Appellant met his second wife in 1996, and they started living together
in 1997.  She is the mother of the
complainant and his little brother. 
Appellant described the various jobs which he had; then he said that his
second wife, the complainant=s mother, Astarted
drinking and doing drugs.@  At that time, appellant left
his second wife and her two sons; he went back to his first wife.  They lived in the same apartment complex,
and he knew that the government took appellant and his brother from their
mother.  Shepherd later told appellant
that she had gotten custody of the children. 


Appellant
testified that he did not stick his penis in the complainant=s mouth and that he did not stick his penis
in the complainant=s
anus.  Appellant testified that he was Ainnocent of these charges@ and that he was telling the truth.  During cross-examination, appellant admitted
that he was Amarried to two women at the same time.@  

After
appellant rested, the State read portions of the therapy records to the
jury.  Those records show that the
complainant told his therapist that appellant had Astuck his private into my body.@ 
During another therapy session, the complainant said that appellant had
done Asomething nasty.@  When
the therapist asked him what, the complainant said that appellant Ahad sex with him.@  When
the therapist asked him what he meant, the complainant said that appellant Astuck his private in his bottom.@ 
During that session, the complainant also told his therapist that
appellant had Athreatened his mom@ if the complainant told anyone what had
happened. 

                                                          Sufficiency
of the Evidence

In
reviewing claims that the evidence is not Alegally sufficient@ to support a conviction, an appellate court is required to Aview the evidence in the light most favorable
to the verdict@ and determine whether Aany rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.@ 
Jackson v. Virginia, 443 U.S. 307, 319 (1979); Mason v. State, 905
S.W.2d 570, 574 (Tex.Cr.App.1995), cert. den=d, 516 U.S. 1051 (1996).  The
jury is the exclusive judge of the credibility of the witnesses and of the
weight to be given to their testimony. 
Barnes v. State, 876 S.W.2d 316, 321 (Tex.Cr.App.), cert. den=d, 513 U.S. 861 (1994).

In
reviewing claims that the evidence is not Afactually sufficient@ to support a conviction, an appellate court is to set aside the
conviction only if it is Aso contrary to the overwhelming weight of the evidence as to be clearly
wrong and unjust.@  Clewis v. State, 922 S.W.2d 126, 129
(Tex.Cr.App.1996).

The
evidence which has been quoted or summarized earlier in this opinion is both Alegally sufficient@ and Afactually sufficient@ to support the jury=s finding that, on or about December 25, 1999, in Dallas County,
appellant did unlawfully:








[C]ause the contact and penetration of the
anus of [the complainant], a child, who was not then the spouse of the
defendant, by an object, to-wit: the sexual organ, of FREDDY ANTONIO RUIZ
AVILES, and, at the time of the offense, the child was younger than 14 years of
age.

 

Issue
No. 1 is overruled.

                                               Confrontation
of Witness

Appellant argues in his next two issues that the trial court denied his
constitutional right to confront the child witness who testified against
him.  In Issue No. 2, appellant presents
his claim under U.S. CONST. amend. VI. 
In Issue No. 3, appellant presents his claim under TEX. CONST. art. I, ' 10. 
The United States Supreme Court held in Maryland v. Craig, 497 U.S. 836,
860 (1990), that, when a trial court makes Aa case specific finding of necessity,@ the Confrontation Clause does not prohibit a State from using a
one-way closed-circuit television procedure for the receipt of testimony by a
child witness in a child abuse case.

The reporter=s
record shows that the State called the complainant as its first witness.  When the complainant did not appear, the
trial court had the sheriff take the jury from the courtroom.  The following proceedings then took place in
open court:

THE COURT: Be seated.  Let the record reflect the jury has been
removed. [Prosecutor], would you please inform the Court of the problem?

 

[PROSECUTOR]: Yes, Your
Honor.  I believe when the child - -
when I went to get him to have him come to the courtroom, he started shaking,
crying, saying he=s
scared, that he didn=t - -
You know, I told him several times that the Defendant was going to be in there,
but he didn=t - - he saw through the window, and he said,
AIs that him?@  And he was shaking and
crying.  He said he was scared to go in
here and see him.

 

                                                           *    *   
*

 

THE COURT: Did you
anticipate this problem?

 

[PROSECUTOR]: I had no
anticipation.  When I have talked to him
in my office, he=s been fine.

 

                                                           *    *   
*

 








THE COURT: Let the record
reflect the jury is not present.  Let
the record further reflect that the State is bringing the Complainant in.  The Complainant=s head is down, his eyes are closed, and his
hands over his eyes.  He will not look
toward the Defendant=s side
of the room....The Court has serious concerns over the ability of the State to
put this witness on the stand in the jury=s presence.

 

[PROSECUTOR]: We just,
upon our own motion, would do a motion for closed circuit.

 

THE COURT: [Defense
Counsel]?

 

[DEFENSE COUNSEL]: Your
Honor, we=ll object to the motion for closed
circuit.  At the onset of this trial, it
was made clear to me that this witness was able to testify in court.  Therefore, I don=t believe we did a sufficient voir dire to
find out whether these jurors would be prejudiced in that the presumption of
innocence would be eroded by the mere fact the witness testifies via
closed-circuit TV.  Therefore, under the
circumstances, we=ll
object. 

 

And we also feel that
this witness would be competent to testify here in court and does not require
closed-circuit TV.

 

THE COURT: Let the record
reflect that the child still has not raised his head.  He still has his eyes closed, and [one of the prosecutors] is now
taking him out of the room.

 

                                                           *    *   
*

 

THE COURT: I am going to
grant the State=s motion for closed circuit.  And frankly, I would have granted it on my
own motion had the State not made it.  

 

I will allow the State a
few more minutes to see if they can prepare the witness....I will certainly
allow him to testify live in front of the jury if he can do so.  At this moment, I=m overruling the Defendant=s objection and granting my own motion and
the State=s motion for closed circuit.

 








Before the
jury was brought back into the courtroom, the trial court examined the
complainant to make sure that he was competent to testify and that he knew the
difference between Atelling
the truth@ and Atelling a lie.@  The complainant was then sworn, and he
promised that he would tell the truth and nothing but the truth.  Then the jury was brought back into the
courtroom, and the complainant attempted to testify in the presence of the
jury.  He was able to tell the jury his
name, his age, and where he went to school. 
He was also able to answer some general, background questions; however,
when the questioning got to what appellant had done to him, the record reads in
relevant part as shown:

Q: What=s the first thing you remember that you didn=t like? 
Did [appellant] touch you somewhere?

 

A: Yes.

 

Q: And was
it a touch that you didn=t like?

 

A: Yes.

 

Q: Where
did he touch you?

 

A: (No
audible response.) 

 

Q: [The
complainant], do you not like talking about it?

 

A: No.

 

Q: How
come?

 

A: I don=t want to talk about it.

 

Q: It=s real important that you tell these nice
people, okay, what happened.  Where did
he touch you?

 

A: (No
audible response.) 

 

                                                           *    *   
*

 

Q: Did he
make you do something to him that you didn=t like?

 

A: Yes.

 

Q: Can you
take your hands off your face so we can hear you?

 

A:
(Witness complies.)

 

Q: [The
complainant], what did he make you do?

 








A: ([No audible
response.)

 

                                                           *    *   
*

 

THE COURT: Let the record
reflect that the witness was brought in at 10:40 and the jury was removed from
the courtroom at 10:53.

 

The Court=s of the opinion, based upon the observation
of the witness, that the closed circuit is the only way that the witness should
testify in this trial.

 

We hold that the trial court made the Acase-specific finding of necessity@ which is required by Maryland v. Craig, supra at 860, to permit the
State to use Aa one-way closed circuit television procedure
for the receipt of testimony by a child witness in a child abuse case.@  This
court held in Hightower v. State, 736 S.W.2d 949, 951 (Tex.App. - Eastland
1987), aff=d, 822 S.W.2d 48 (Tex.Cr.App.1991), that this
procedure in a child abuse case did not violate the Confrontation Clause.  See also TEX. CODE CRIM. PRO. ANN. art.
38.071 (Vernon Pamph. Supp. 2002); Marx v. State, 987 S.W.2d 577, 580
(Tex.Cr.App.1999); Gonzales v. State, 818 S.W.2d 756, 764
(Tex.Cr.App.1991).  Issues Nos. 2 and 3
are overruled. 

                                                       Jury
Voir Dire

The trial court=s decision to allow the child to Atestify via closed circuit television@ did not violate appellant=s rights to Adue
process@ and Adue course of law.@  There is no showing that this
procedure would Aerode the presumption of innocence.@  Marx
v. State, supra at 581.  Issues Nos. 4 and
5 are overruled.

                                                   Extraneous
Offense

During the punishment phase of trial, the complainant=s younger brother was permitted to testify
about acts of child abuse which appellant did to him.  The trial court=s charge to the jury on the punishment portion of trial contained the
following instruction:

You are instructed that
if there is any testimony before you in this case regarding the Defendant
having committed extraneous offenses or bad acts you may not consider such evidence
for any purpose, unless you find and believe beyond a reasonable doubt that
the Defendant committed such offenses or bad acts, if any.  

 








The burden is upon the
prosecution to prove such extraneous offenses or bad acts beyond a reasonable
doubt.  The prosecution does not have to
prove extraneous offenses or bad acts beyond all possible doubt.  The prosecution=s proof must exclude all reasonable doubt
concerning the extraneous crime or bad act.

 

Therefore, if you find
and believe beyond a reasonable doubt that the Defendant committed an
extraneous offense or bad act, then you may consider such 

evidence in assessing the Defendant=s punishment.  If you do not so find or you have a reasonable doubt as to
whether the Defendant committed an extraneous offense or bad act, then you may
not consider such evidence, if any, for any purpose.  (Emphasis added)

 

Since the trial court did not fail to give a Aburden of proof@ instruction regarding the extraneous offense testimony given during
the punishment phase of trial, Issue No. 6 is overruled.

                                                    This
Court=s Ruling

The judgment of the trial court is affirmed.

 

BOB DICKENSON

SENIOR JUSTICE

 

August
15, 2002

Do not publish.  See TEX.R.APP.P. 47.3(b).    

Panel consists of:  Wright, J., and

McCall, J., and
Dickenson, S.J.[2]











[1]He was 9 years old at the time of trial, and he was 7
years old Aon or about@
December 25, 1999, the date of the offense which was alleged in the
indictment.  





[2]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.