Filberto CAVAZOS, III, Appellant,

v.

The STATE of Texas, Appellee.

No. 3–83–171–CR.

Court of Appeals of Texas,
Austin.

March 7, 1984.

**436**

Nathaniel G. Rhodes, Corpus Christi, for appellant.

Ronald Earle, Dist. Atty., Carl Bryan Case, Asst. Dist. Atty., for appellee.

Before SHANNON, EARL W. SMITH and GAMMAGE, JJ.

PER CURIAM.

A jury found appellant guilty of rape and assessed punishment at imprisonment for twenty years. Tex.Pen.Code Ann. § 21.02 (Supp.1982). Finding appellant's six grounds of error to be without merit, we affirm the judgment of conviction.

The complaining witness, whom we will refer to as L.L., was a student at the University of Texas. On October 1, 1982, L.L. took two examinations after staying up most of the preceding night to study and then went to work as a driver for the university shuttle bus system. After work, L.L. met several friends at a restaurant to celebrate the birthday of another member of the party. From the restaurant, the party moved to a bar, and from that bar to another bar, referred to in the testimony as "Ed's" on Sixth Street.

During the course of the evening, L.L. drank more than was her custom. This, together with her fatigue, caused her to become ill while at Ed's, and she threw up in the women's restroom. As she left the restroom, she saw a man standing at the bar who she thought was a student in one of her classes at the university. At trial, L.L. identified appellant as the man in question.

L.L. spoke to appellant and, after an exchange of pleasantries, told him she was ill and that she was going to ask one of her friends to take her home. Appellant told L.L. that he was just leaving and would be happy to give her a ride. While initially reluctant to accept appellant's offer, L.L. finally agreed.

As L.L. was getting into appellant's van, she was approached by Bruce Glick, one of the friends with whom L.L. had spent the evening. L.L. told Glick that appellant was a classmate and was going to take her home. Appellant told Glick not to worry, and drove off with L.L. in the van. Glick, suspicious of appellant, wrote down the license plate number of the van. Glick also identified appellant at trial.

In answer to questions by the assistant district attorney, L.L. described what happened after she and appellant left Ed's:

Q: Where did you-all go?

A: Remember we were traveling west down Sixth Street then I started feeling real dizzy and sick and put my head down in my hand and so I didn't see where we were driving. The next time I looked up we were heading north on Mopac.

Q: Do you know how you got to Mopac?

A: No.

Q: Do you usually go home to Enfield via Mopac?

A: No.

Q: During this first part, did you say anything to that person?

A: Yes, I asked him how he was doing in class and if he had turned in his paper yet and things like that.

Q: And what did he say?

A: He was trying to answer me, but he was giving really vague answers and that's when I became aware that he didn't know what I was talking about.

Q: Okay. When you say he gave vague answers, answers in regard to your class?

A: Yes.

Q: Were you asking questions that a person would normally ask?

A: I said, "How are you doing in the class?" He said, "Oh fine." I said, "What do you think of that assignment she gave us?" He said, "Oh, I don't know." And he just never would say anything about it. And then I realized he didn't know what I was talking about.

Q: Do you know at what point it was you realized that?

A: As—well, that's when I looked up and noticed we were heading north on Mopac.

Q: Okay. When you saw that, then what did you do?

A: I suddenly realized I didn't know who this man was and I didn't know where he was taking me.

Q: Okay. Did you say something to him?

A: I said where—I said, "Where are we going?" And he said, "Don't worry, we're just going to a friend's house first and then I'll take you home." And I said, "Please take me home right now. This is not the way to go." He said, "Don't worry about it, you'll get home."

Q: At that point did you know who you were with?

A: No, I realized he was a total stranger and I had no idea who he was.

Q: What did you do?

A: I got scared and I started crying, asking him to please take me home.

Q: Why were you scared?

A: Because I suddenly realized I was in this van late at night and I had no idea who this man was and I had a sudden realization he was not the person I thought he was.

Q: All right. When you asked him to take you home, did he do that?

A: No, he kept going north on Mopac.

Q: Did you say anything else to him?

A: I was crying by that time and pleading with him, "Please, just turn around here, take me home." He wouldn't.

Q: Did you try and escape?

A: No, we were going too fast on the highway. I was scared.

Q: Did you—did you try and hit him?

A: No.

Q: Then what happened?

A: I was crying so hard I could barely get my breath, and so I had—I was just so scared I couldn't think and I was trying to get my wits together and think of what to do. So I had my head down like that and I looked up from time to time and we had turned off from Mopac. I'm not sure what road we were on, I just remember seeing one sign that said Route 2222, and the I—I remember we were on a dark, winding road. And I looked up another time and remember seeing a sign that said something about Mansfield Dam, but I'm not sure where we were.

Q: Did you see any landmarks other than that that you recognized at any point?

A: No.

Q: How were you feeling physically by then?

A: Scared out of my mind. I was just shaking and trembling, I felt like I was getting sick again and I was just almost—I was feeling faint. I was just trying to keep ahold of myself so I wouldn't black out or anything.

Q: Okay. What's the next thing that happened?

A: We pulled off the road we were on to some small gravel road and went I don't remember how far, maybe a hundred yards, and he stopped. And it was like in the middle of a clearing. He had a—before he turned off the headlights I realized there were trees all around us, and bushes, and there were no other lights out there.

Q: Okay. And you recognized—did you recognize that place?

A: No, I've never been out there before.

After stopping, appellant forced L.L. into the back of the van, removed her clothes, and compelled her to engage in several acts of sexual and deviate sexual intercourse. Appellant then drove to Enfield Road where, approximately one block from her apartment, L.L. jumped from the van and ran home.

Appellant does not challenge the sufficiency of the evidence to support the jury's findings as to the essential elements of the offense. However, appellant does contend the trial court erred by refusing his motion for an instructed verdict of not guilty based on the failure of the State to prove venue in Travis County as alleged in the indictment.

L.L. was never asked if any of the streets, highways, or locations referred to in her testimony were located in Travis County. Indeed, the only question asked L.L. relevant to the venue issue was, "When you started out that evening, did that occur in Travis County?" Given the ambiguity of the question, L.L.'s affirmative answer is of no assistance in resolving the question presented by this ground of error.

After examining the record in light of the opinion in *Black v. State,* 645 S.W.2d 789 (Tex.Cr.App.1983), we find the only probative evidence relating to venue to be the statement by Glick that Ed's bar, where L.L.'s encounter with appellant began, is located in Austin. This Court may judicially notice that Austin is in Travis County. *Edwards v. State,* 427 S.W.2d 629 (Tex.Cr.App.1968).

Rape may be prosecuted in the county in which it is committed, in the county in which the victim is abducted, or in any county through or into which the victim is transported in the course of the abduction and rape. Tex.Code Cr.P.Ann. art. 13.15 (Supp.1982). Venue may be proved by a preponderance of the evidence, either direct or circumstantial. Tex.Code Cr.P.Ann. art. 13.17 (1977); *Banks v. State,* 530 S.W.2d 940 (Tex.Cr.App.1975); *Haynes v. State,* 140 Tex.Cr.R. 52, 143 S.W.2d 617 (1940).

There is no probative evidence that the rape of L.L. occurred in Travis County. Appellant argues there is also no evidence that the abduction of L.L. took place in Travis County because she voluntarily left Ed's with him. It is appellant's contention that L.L. was not abducted until she realized appellant was not the person she thought him to be and began asking him to release her. Because there is no probative evidence that L.L. became aware of her plight while in Travis County, or that any of the subsequent events took place in Travis County, appellant concludes that venue was not proved.

"Abduct," as it is used in article 13.15, supra, has no technical meaning. *Fairfield v. State,* 610 S.W.2d 771, 778 n. 12 (Tex.Cr.App.1981). While the ordinary meaning of the term generally connotes the use of force, such a connotation is not "invariable." *Id.* A widely used dictionary of the English language defines "abduct" as "to take (a person) away unlawfully and by force *or fraud*" [emphasis added]. Webster's New World Dictionary (Second College Edition, 1980). Moreover, for the

purpose of prosecution under Chapter 20 of the Penal Code, one may abduct another by use of deception and without the use or threatened use of force. Tex.Pen.Code Ann. § 20.01(1)(A) and (2)(A) (1974).

■ The evidence establishes that at the time she entered appellant's van, L.L. mistakenly believed appellant to be someone else, that appellant was aware of this mistaken belief, and that appellant actively encouraged L.L. to believe that he was her classmate. The evidence is also sufficient to support the conclusion that appellant's promise to L.L. to take her home was fraudulent, and that appellant actually intended to transport L.L. to a secluded location and rape her. We hold the abduction of L.L. began at Ed's bar when appellant induced her to enter his van by means of fraud and deception. Because Ed's was shown to be located in Travis County, the evidence is sufficient to establish venue as alleged in the indictment. The third ground of error is overruled.

Appellant filed two motions to quash complaining of various alleged defects in the indictment, three of which he brings forward on appeal. In pertinent part, the indictment alleges appellant:

did then and there intentionally and knowingly have sexual intercourse with [L.L.], a female not his wife, without [L.L.]'s consent, and the said Filberto Cavazos III compelled [L.L.] to submit by the use of a threat that would prevent resistance by a woman of ordinary resolution under the same and similar circumstances because of a reasonable fear of harm; and the said Filberto Cavazos III did then and there intentionally and knowingly compel the said [L.L.] to submit to sexual intercourse with the Filberto Cavazos III by threat of serious bodily injury to be imminently inflicted on [L.L.].[1]

1. This indictment alleges aggravation pursuant to Tex.Pen.Code Ann. § 21.03(a)(2) (1974), despite the fact that § 21.03 was amended over one year before the assault on L.L. and the return of the indictment. *See* Tex.Pen.Code Ann. § 21.03 (Supp.1982).

■ Appellant first contends the trial court erroneously overruled his motion to quash on the ground that the indictment states more than one offense in a single paragraph in violation of Tex.Code Cr.P. Ann. art. 21.24(b) (Supp.1982). Appellant bases this contention on the presence of a semicolon before the clause alleging the aggravating element. This contention is without merit. While this indictment is no model, it is clear the indictment alleges the single offense of aggravated rape. *See Banks v. State*, 530 S.W.2d 940 (Tex.Cr. App.1975).

■ Next, appellant contends the trial court erred by overruling his motion to quash complaining that the indictment fails to state to whom the "threat that would prevent resistance" was directed. Although it is established error to overrule a motion to quash seeking the name of the person against whom a threat of death or serious bodily injury is directed, *Goss v. State*, 580 S.W.2d 587 (Tex.Cr.App.1979), there are no published opinions speaking to the question presented by appellant.

■ Assuming without deciding that the rule stated in *Goss* and other similar cases applies to the threat referred to in § 21.-02(b)(2) of the Penal Code, we hold the trial court did not err in overruling the motion to quash. The indictment alleges appellant "compelled [L.L.] to submit by the use of a threat that would prevent resistance by a woman of ordinary resolution ... because of a reasonable fear of harm," and that he "compel[led] the said [L.L.] to submit ... by threat of serious bodily injury to be imminently inflicted on [L.L.]." When the indictment is read in a common-sense manner, it is apparent the "threat that would prevent resistance" was the "threat of serious bodily injury to be imminently inflicted on [L.L.]."

Because the evidence was insufficient to prove aggravation as alleged, *Rucker v. State*, 599 S.W.2d 581 (Tex.Cr.App.1980), the State abandoned the allegation of aggravation and the case was submitted to the jury as one of rape only. The evidence was sufficient to establish aggravation under § 21.03(a)(2) (Supp.1982).

In his final ground of error concerning the indictment, appellant argues the trial court erred by overruling his motion to quash complaining of the indictment's failure to allege whether the "threat that would prevent resistance" was "communicated by actions, words, or deeds." The latter phrase was added to § 21.02(b)(2) in 1975, and has garnered little comment in the reported decisions. However, in *Boston v. State*, 642 S.W.2d 799 (Tex.Cr.App. 1982), the court offered this observation:

How else is a threat usually communicated unless "by actions, words or deeds?" The 1975 insertion of the phrase appears to be more for purposes of clarification than of substance, specifying what we all know: that a threat may be made by means other than vocally.

642 S.W.2d at 802.

*Brem v. State*, 571 S.W.2d 314 (Tex.Cr. App.1978), involved a rape committed after the effective date of the 1975 amendment to § 21.02(b)(2). The indictment alleged the defendant had sexual intercourse with the complaining witness "without the consent of the Complainant, by means of force and threats." The court held:

Appellant's contention that the indictment should have been quashed because it failed to allege the circumstances which made the act of intercourse non-consensual is likewise without merit. The indictment alleged that appellant had sexual intercourse with the complainant "without the consent of the Complainant, by means of force and threats." It is not necessary that the indictment allege the facts and circumstances of the offense which made the act of sexual intercourse non-consensual. The allegations of "force" and "threats" were sufficient to place appellant on notice of the kind of lack of consent upon which the State would base its case. [Citations omitted.] This being true, no further factual allegations were necessary and the indictment was not subject to a motion to quash on this ground.

571 S.W.2d at 317. *See also Johnson v. State*, 633 S.W.2d 888 (Tex.Cr.App.1981).

The central element of rape is lack of consent on the part of the female and consent is lacking when, *inter alia*, submission is compelled by threat. *Boston v. State, supra*. The manner by which the threat is communicated, whether by actions, words, or deeds, is essentially evidentiary. In this sense, we find appellant's motion to quash to be analogous to a motion to quash a burglary indictment complaining of the failure to allege the method of entry employed under Tex.Pen.Code Ann. § 30.02(b) (1974). *See Marrs v. State*, 647 S.W.2d 286 (Tex.Cr.App.1983).

The trial court did not err in overruling appellant's motions to quash the indictment. Grounds of error one, two, and four are overruled.

In his fifth and sixth grounds of error, appellant contends the prosecutor "manufactured" a reputation witness, and that the trial court erred in allowing this witness to testify over appellant's objection. The witness in question was Frances Mahan, who testified at the punishment stage of the trial that appellant's reputation for being a peaceful and law-abiding citizen was bad.

Appellant's contention that Mahan's testimony was "manufactured" by the State is based on her statement during voir dire examination outside the presence of the jury that, on the day before she was called to testify, she had discussed appellant with members of the district attorney's staff and had been told by them that appellant was known to have raped at least four other women. Were this the only basis for Mahan's testimony, appellant's grounds of error would be meritorious. *Jackson v. State*, 628 S.W.2d 446 (Tex.Cr.App.1982); *Wright v. State*, 609 S.W.2d 801 (Tex.Cr. App.1980).

Mahan also testified during her voir dire examination that she had been raped by appellant in January, 1982. Based on information concerning her assailant that Mahan was able to provide, several police officers and an employee of the Austin Rape Crisis Center told Mahan they knew

her assailant and that he was a suspect in several other rapes. Mahan learned appellant's name through the employee of the rape crisis center. On the basis of this testimony, we find that Mahan was qualified to testify to appellant's reputation in the community for being a peaceful and law-abiding citizen, and that the trial court did not err in overruling appellant's objection to her testimony.

The judgment of conviction is affirmed.