# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00721-CR

**Henry Gauna, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
## NO. 3040205, HONORABLE JON N. WISSER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Henry Gauna of aggravated sexual assault of a child. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B), (a)(2)(B) (West Supp. 2006). Gauna elected to have punishment assessed by the trial court, which found that Gauna had previously been convicted of indecency with a child and sentenced him to imprisonment for life in the Institutional Division of the Texas Department of Criminal Justice. *See id.* § 12.42(c)(2)(A)(I), (c)(2)(B)(ii) (West Supp. 2006) (mandating life imprisonment for defendant convicted of aggravated sexual assault with prior conviction for indecency with child). Gauna raises ten points of error on appeal, arguing that the evidence presented at trial is legally and factually insufficient to prove various elements of the crime and that the trial court erred by admitting certain testimony over Gauna's objection and allowing the seven-year-old complainant to testify by closed-circuit television. We will affirm the trial court's judgment.

**BACKGROUND**

The complainant, E.J.D., was six years old at the time of the events in question and seven years old at trial. Since she was nine months old, E.J.D. has lived with her maternal grandmother, Antonia Davis. Samanthea Davis, E.J.D.'s mother, was fifteen years old when she gave birth to E.J.D. and abandoned her shortly thereafter, according to Antonia.[1]

In late September 2003, Antonia's car broke down, and Samanthea began providing transportation to get Antonia and E.J.D. to and from work and school. Samanthea would pick up Antonia and E.J.D. in time to get Antonia to work by 6:00 a.m., bring E.J.D. back to Samanthea's apartment, then drive E.J.D. to school; she would pick up Antonia and E.J.D. in the afternoon. Samanthea and her two younger children shared an apartment with her sister Dorothea Contreras and Contreras's child. Around the same time, Samanthea started dating Gauna, who began spending much of his time at Samanthea's apartment. Gauna frequently stayed overnight at the apartment.

One morning in early October, Gauna accompanied Samanthea when she picked up Antonia and E.J.D. A few days later, Gauna showed up alone at Antonia's house in Samanthea's car. Gauna explained that Samanthea was asleep, so he would be transporting Antonia and E.J.D. For about a week and a half after that, Gauna arrived alone at Antonia's house every morning around 5:30 a.m., took Antonia to work and E.J.D. to school, and picked them up in the afternoon.

On October 16, after having a heated argument with Gauna, Samanthea related some troubling information about him to Antonia. Antonia testified that this information caused her to

---

[1] For convenience, we refer to Antonia Davis and Samanthea Davis by their first names.

question E.J.D. about whether "Henry had touched her inappropriately in areas that he was not supposed to." Antonia continued that E.J.D. "said yes, and she pointed to her chest and to her private part." E.J.D. was acting nervous and scared, and Antonia reassured E.J.D. that she had not done anything wrong and that she would not get in trouble for telling Antonia what happened. E.J.D. then described what Gauna had done:

> [A]fter [Gauna] would drop [Antonia] off at work, he would drive off to a—some parking lot with lots of trees and no lights and dark—dark place. And then he would climb in the back seat and pull [E.J.D.'s] pants down and put his thing in her piggy and start wiggling.

E.J.D. and others testified that E.J.D. refers to her vagina as her "piggy." Antonia asked E.J.D. how many times Gauna had done this to her. While attempting to count on her fingers, E.J.D. first replied that it had occurred thirteen times, then stated that Gauna did this twenty-seven times, according to Antonia. Antonia also testified that E.J.D. related that, while most instances occurred in Samanthea's car, it had also happened in Samanthea's bed and in the living room of Samanthea's apartment.

After hearing these allegations, Antonia called Contreras to pick her up to take E.J.D. to a hospital. Antonia stated that she did not call Samanthea both because she was not home and because "Samanthea does not really concern herself about [E.J.D.]'s well-being." When she arrived, Contreras questioned E.J.D. about what Gauna had done to her. Contreras testified that, although E.J.D. was hesitant to talk about it, she eventually told Contreras that in the mornings after Gauna had dropped Antonia off at work, he drove E.J.D. to a "dark place in a park-like area" and got on top

3

of her inside the car and kissed her. Contreras then asked E.J.D. whether Gauna ever touched her below the waist, and she replied that he had.

Antonia and Contreras took E.J.D. to Brackenridge Hospital where she was examined by Dr. Stan Rice, an emergency room physician, shortly after midnight on October 17. Rice testified that E.J.D. was sleeping as he entered the room and that he had to wake her up to speak to her. Rice stated that E.J.D. was shy and that he did not spend "enough time to develop a significant rapport" with her. Antonia testified that E.J.D. appeared to be nervous around Rice and did not want to talk to him, look at him, or have him touch her.

E.J.D. told Rice that something had happened to her but she was not quite sure what it was. E.J.D. stated that Gauna laid on top of her and thrust his body back and forth. When Rice asked E.J.D. whether Gauna's penis entered her vagina, rectum, or mouth, she replied that it had not; however, Rice testified that E.J.D. "was not real clear on any of these details." Antonia testified that Rice did not use words like "piggy" that were familiar to E.J.D. Rice testified that he attempted to explain ejaculation to E.J.D. and that she stated that "she wasn't sure that [Gauna] had spilled any liquids onto her."

Rice performed a visual examination of the exterior of E.J.D.'s genitals and found no evidence of bruising, bleeding, or discharge from her vagina or rectum. Rice did not use any instruments to magnify the area he examined and did not examine the inside of E.J.D.'s vagina. Based on his conversation with E.J.D., the findings of his visual examination, and the information related by the hospital's social worker that the most recent alleged sexual assault was at least two days prior and that E.J.D. had bathed since then, Rice concluded that a full examination by a sexual

4

assault nurse examiner would not have been useful. Nevertheless, Rice decided that "calling CPS [was] warranted." Antonia and E.J.D. met with representatives of Child Protective Services and the Austin Police Department at the hospital.

Dr. Beth Nauert, the medical director of the Child Assessment Program, interviewed and examined E.J.D. on November 12, 2003, at the request of the Austin Police Department. Nauert testified,

> [E.J.D.] told me she had come to see me because she was touched by, quote, Henry, my momma's boyfriend, end quote. She stated that this would happen in the car. She said, quote, one time he did it in the back seat and a lot of times he did it in the front seat, end quote.
>
> When I asked [E.J.D.] where Henry touched her, she pointed to her vaginal area. When I asked her what he touched her with, she says, quote, two things, his hand and his thing, end quote. When I asked her whether her clothes were on or off, she said that her pants were off and her underwear was off and his pants were down and his boxers were down.
>
> [E.J.D.] said that Henry would touch her vaginal area, quote, inside, end quote. When I asked her what he told her, she said, quote, don't tell anyone or he'd never see anyone or my mom again, end quote.

After interviewing E.J.D., Nauert performed a physical examination. Nauert used a colposcope[2] to examine E.J.D.'s vaginal and rectal areas. Nauert testified that E.J.D. had a normal genital examination and a normal head-to-toe examination; Nauert found no injuries. Nauert testified that she was not surprised by the normal examinations because only around twenty-five percent of child

---

[2] A colposcope is "an instrument for examination of the tissues of the vagina and cervix by means of a magnifying lens." *Dorland's Illustrated Medical Dictionary* 393 (Douglas M. Anderson chief lexicographer, 30th ed. 2003) [hereinafter *Dorland's*].

victims of sexual abuse with penetration have abnormal examinations. Nauert explained that redness and swelling may disappear within a matter of hours and that bruises and tears can heal over a few days.

E.J.D. began treatment with Helen Williams, a licensed professional counselor, in February 2004. Williams testified that she began treating E.J.D. for a variety of emotional and behavioral issues, including encopresis,[3] enuresis,[4] fear of the dark, difficulty falling asleep, aggressive behavior, hostility, and age-inappropriate behavior such as using "baby talk" and hiding from Antonia and other caregivers. Williams stated that play therapy and art therapy were effective for E.J.D. and that her problem behaviors and overall demeanor improved as she continued attending counseling sessions with Williams. Around July 2004, Antonia was notified that Gauna's trial was approaching; she asked Williams to talk to E.J.D. about testifying against Gauna in court. Williams testified that E.J.D.'s problem behaviors reappeared at that time: her encopresis and enuresis became major problems again, she started using "baby talk" and hiding from caregivers again, her sleeping difficulty returned, and she began spending many nights on the bathroom floor with the light on.

## DISCUSSION

**Sufficiency of the Evidence**

### *Penetration*

In his first and third points of error, Gauna argues that the evidence presented at trial is legally and factually insufficient to support a finding that he penetrated E.J.D.'s sexual organ.

---

[3] Encopresis is "fecal incontinence that does not have an organic cause." *Dorland's*, *supra* note 2, at 611.

[4] Enuresis is "urinary incontinence after the age at which urinary control should have been achieved." *Dorland's*, *supra* note 2, at 623.

However, as the State notes, penetration is not an essential element of aggravated sexual assault. The penal code provides that a person commits aggravated sexual assault if he intentionally or knowingly "causes the sexual organ of a child to *contact* or penetrate the mouth, anus, or sexual organ of another person." Tex. Penal Code Ann. § 22.021(a)(1)(B)(iii) (emphasis added).

In the indictment, the State alleged both that Gauna caused penetration of E.J.D.'s sexual organ with his sexual organ and that Gauna caused contact between E.J.D.'s sexual organ and his sexual organ. The State argued both theories in its closing arguments. Even though some or all of the jurors may have relied on the penetration theory to reach a guilty verdict, any juror who believed beyond a reasonable doubt that Gauna's sexual organ penetrated E.J.D.'s sexual organ necessarily believed that E.J.D.'s sexual organ contacted Gauna's sexual organ. *See Vick v. State*, 991 S.W.2d 830, 834 n.2 (Tex. Crim. App. 1999) (stating that penetration of genitals necessarily includes contact); *Hendrix v. State*, 150 S.W.3d 839, 848 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (rejecting challenge to lack of juror unanimity in case with similar pleadings "because all of the jurors who believed there was penetration necessarily also believed that antecedent contact had occurred"). Because Gauna does not challenge the sufficiency of the evidence supporting a finding that he caused E.J.D.'s sexual organ to contact his sexual organ, we do not reach his first and third issues. *See Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000) (limiting legal and factual sufficiency review to "essential elements").

### Identity

In his second and fourth points of error, Gauna argues that there is legally and factually insufficient evidence to support a finding that he is the individual that sexually assaulted E.J.D. Gauna bases this argument on E.J.D.'s inability to identify a photograph of Gauna at trial. On direct examination by the State, the following exchange occurred:

7

Q: If I show you a picture of Henry, would you recognize him?

A: Yes.

Q: Okay. I want to show you what's been marked as State's Exhibit number six and ask you to look at this. Do you recognize this? Is there—does the person in this picture look familiar?

A: No.

Q: This person doesn't look familiar?

A: (Witness moving head side to side).

Q: You don't know who that is?

A: (Witness moving head side to side).

Q: Do you know what Henry looks like?

A: No.

In reviewing a legal sufficiency challenge, we look at all the evidence in the light most favorable to the prosecution to determine whether a rational jury could have found the challenged element beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Johnson*, 23 S.W.3d at 7. When determining whether the evidence of a challenged finding is factually sufficient, we review all the evidence in a neutral light and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Johnson*, 23 S.W.3d at 6-7. In conducting a factual sufficiency review, we must defer to the jury's findings. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). We may not reweigh the evidence and set aside a jury verdict simply because we feel that a different result is more reasonable. *Id.*

8

Although E.J.D. was unable to identify a photograph of Gauna at trial, ample other evidence was presented linking Gauna to the sexual assault. E.J.D. testified that the person who sexually assaulted her was her mother's boyfriend "Henry" who would take her grandmother to work and take E.J.D. to school. E.J.D. testified that her mother only had one friend named Henry that took her to school. The testimony of all the prosecution witnesses who spoke about what E.J.D. told them concerning her sexual assault indicated that E.J.D. has always identified her assailant as her mother's boyfriend "Henry" who took her to school.

Antonia identified Gauna as the man named Henry who was dating Samanthea in September and October 2003 and as the man who took Antonia to work and E.J.D. to school. Samanthea also identified Gauna as the man named Henry whom she had dated and who took E.J.D. to school. Likewise, Contreras identified Gauna as the man named Henry who began spending a lot of time at Samanthea's apartment in late September 2003 and who picked E.J.D. up in the mornings.

Detective Robert Bowers of the Austin Police Department testified that when he spoke with Gauna, "he confirmed that he . . . was seeing Samanthea." Bowers also testified that, during the investigation, he showed E.J.D. the same photograph that she was unable to identify at trial, and she reacted by saying, "That's Henry."

A reasonable jury could have decided to credit the other evidence linking Gauna to the crime despite E.J.D.'s inability to identify the photograph at trial. The trial occurred over a year after the last time seven-year-old E.J.D. had any contact with Gauna, and testifying at trial was a source of significant stress for E.J.D. Also, Bowers testified that he showed E.J.D. the same photograph in a less stressful setting that was closer in time to E.J.D.'s most recent contact with Gauna and that she identified the person in the photograph as "Henry." We hold that the evidence

presented at trial is legally and factually sufficient to support a finding that Gauna is the person who sexually assaulted E.J.D. Therefore, we overrule his second and fourth issues.

### *Venue*

In his fifth and sixth points of error, Gauna argues that the evidence presented at trial is legally and factually insufficient to demonstrate that the events occurred in Travis County. Gauna contends that the only evidence regarding where the sexual assaults occurred came from E.J.D., who could not verify that the location is in Travis County.

In criminal cases, venue must be proved by a preponderance of the evidence. Tex. Code Crim. Proc. Ann. art. 13.17 (West 2005). The evidence may be either direct or circumstantial. *Black v. State*, 645 S.W.2d 789, 790 (Tex. Crim. App. 1983); *Gonzalez v. State*, 784 S.W.2d 140, 142 (Tex. App.—Austin 1990, no pet.). In a sexual assault case, venue is proper "in the county in which [the sexual assault] is committed, in the county in which the victim is abducted, or in any county through or into which the victim is transported in the course of the abduction and sexual assault." Tex. Code Crim. Proc. Ann. art. 13.15 (West 2005). The word "abduction" in this statute has no technical meaning and does not necessarily require the use of force. *Cavazos v. State*, 668 S.W.2d 435, 438 (Tex. App.—Austin 1984, pet. ref'd). Alternatively, if the county of the commission of the crime cannot be determined, venue is proper in the county of the defendant's residence or the county where the defendant was apprehended. Tex. Code Crim. Proc. Ann. art. 13.19 (West 2005). Venue may be proved under any theory listed above even if the indictment only alleges that the offense was committed in the county of prosecution. *Id.* art. 13.17.

The jury heard evidence that Antonia's residence, Antonia's place of employment, and Samanthea's residence are all located in Travis County. Evidence was also presented indicating that Antonia was required to be at work by 6:00 a.m. everyday, and Samanthea testified that Gauna

10

returned to her residence with E.J.D. every morning by 6:10 a.m. at the latest. This evidence allows a reasonable inference that the sexual assaults were committed in Travis County or a reasonable conclusion that E.J.D. was abducted in Travis County.

Also, although E.J.D. testified at trial that the sexual assaults only took place in Samanthea's car, Antonia testified that E.J.D. confided that Gauna had raped her in Samanthea's apartment, which is located in Travis County. Furthermore, if it is impossible to determine in which county the sexual assaults were committed, as Gauna contends, the record contains evidence suggesting that venue was proper in Travis County because Gauna resided there. Detective Bowers testified that Gauna resided with his mother in Travis County at the time of the offenses; this testimony was not controverted. We hold that the evidence presented at trial is sufficient to support a finding that venue was proper in Travis County. We overrule Gauna's fifth and sixth issues.

## Admission of Evidence

### *Expert Testimony*

In his seventh point of error, Gauna claims that the trial court erred by admitting the testimony of Dr. William Carter, the State's expert witness who testified about child abuse dynamics, and Helen Williams, E.J.D.'s counselor who testified about E.J.D.'s behavioral issues. Gauna insists that the State used Williams's testimony to set up Carter's testimony,[5] in which he answered

---

[5] Although Gauna's seventh issue challenges the admission of both Williams's and Carter's testimony, Gauna makes no argument explaining why Williams's testimony was inadmissible. Gauna only states that "[t]he prosecutor used Helen Williams to set up Dr. Carter's testimony as she described the behavioral issues which the complainant experienced." We hold that the portion of the issue relating to Williams's testimony is inadequately briefed and therefore waived. *See* Tex. R. App. P. 38.1(h) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Texas Med. Ass'n v. Texas Workers Comp. Comm'n*, 137 S.W.3d 342, 352 n.6 (Tex. App.—Austin 2004, no pet.) (holding that inadequately briefed arguments are waived).

hypothetical questions based on the facts of the instant case. Gauna contends that this testimony was improperly admitted because it directly commented on E.J.D.'s truthfulness.

We review decisions on the admission of expert testimony for an abuse of discretion. *Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006). Expert testimony is admissible where specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue. Tex. R. Evid. 702. Expert testimony does not assist a jury if it constitutes "a direct opinion on the truthfulness" of a child complainant's allegations. *Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997) (quoting *Yount v. State*, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993)). The State may not elicit testimony that a particular child is telling the truth or that child complainants as a class are worthy of belief. *Yount*, 872 S.W.2d at 712.

However, expert testimony that provides useful background information to aid the jury in evaluating the testimony of another witness is admissible. For instance, expert testimony indicating that children who have been sexually abused sometimes give conflicting accounts of their abuse and even recant initial outcries is admissible to assist a factfinder in determining the impeachment value of prior inconsistent statements by a complainant. *Pavlacka v. State*, 892 S.W.2d 897, 903 n.6 (Tex. Crim. App. 1994). In addition, expert testimony explaining that a child exhibits behavioral characteristics that have been empirically shown to be common among children who have been abused is admissible. *Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993); *Perez v. State*, 113 S.W.3d 819, 832 (Tex. App.—Austin 2003, pet. ref'd); *Hitt v. State*, 53 S.W.3d 697, 707 (Tex. App.—Austin 2001, pet. ref'd); *Vasquez v. State*, 975 S.W.2d 415, 417 (Tex. App.—Austin 1998, pet. ref'd). The State may also elicit testimony concerning the typical characteristics of victims of sexual abuse. *Schutz*, 957 S.W.2d at 69.

12

Carter testified about the characteristics of child victims of sexual abuse, explaining that they are usually abused by people known to the family, that they feel shame and confusion about the abuse, that they often wait for long periods before making outcries, that they often tell more and more of the story as time goes on, and how their situations are complicated when their abusers have relationships with their other family members. Carter also testified that certain hypothetical fact situations, based on the facts in the instant case, are consistent with sexual abuse, although they do not prove that abuse has occurred. The following is one such exchange about which Gauna complains:

Q: Doctor, if you had a six-year-old child who was sexually abused by her mother's boyfriend and was asked directly by her grandmother whether anything happened to her, and she told her grandmother "yes" and made an outcry statement to the grandmother that the boyfriend took her to a dark place in the car after he dropped the grandma off at work and got on top of her, pulled his pants down, pulled her pants down, put his thingy in her piggy, which was explained to be his penis and her vagina, and wiggled, would you—is that detailed information in an outcry?

A: If I got that information, I would be very cautious and I would be quite interested in knowing more about what the girl had to tell me.

The answer quoted above is as close as Carter ever came to a direct comment on truthfulness. Carter never claimed that the child accusers in the State's hypothetical situations were telling the truth, that E.J.D. was telling the truth, or that child complainants in sexual abuse cases always tell the truth. Carter was careful to speak in generalities and testified that it was not his position that E.J.D. had been sexually assaulted or that Gauna had sexually assaulted her.

Because Carter limited his testimony to the general characteristics of child victims of sexual abuse and whether hypothetical fact situations are consistent with sexual abuse and because

13

the court of criminal appeals and this Court have upheld the admissibility of such testimony, the trial court did not abuse its discretion by admitting the testimony. We overrule Gauna's seventh issue.

### *Irrelevant, Unfairly Prejudicial, and Hearsay Evidence*

In his eighth and ninth points of error, Gauna contends that the trial court erred by admitting the testimony of Abby Stancik, an investigator with Child Protective Services, and Cyndi Cantu, a forensic interviewer for the Center for Child Protection, because it was irrelevant, unfairly prejudicial, and contained inadmissible hearsay. The subjects discussed during Stancik's testimony included the process used to investigate a claim of sexual abuse, her visits with E.J.D., E.J.D.'s demeanor during those visits, and Samanthea's level of cooperation with Child Protective Services. Cantu testified regarding her qualifications to interview children about sexual abuse, the procedures involved in such an interview, E.J.D.'s interview in particular, and E.J.D.'s demeanor during the interview.

We review a trial court's decision to admit evidence using an abuse-of-discretion standard. *Sells v. State*, 121 S.W.3d 748, 766 (Tex. Crim. App. 2003). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401. Evidence must be relevant to be admissible. *Id.* R. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* R. 403. Trial judges are afforded significant discretion to make admissibility decisions under rule 403. *Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003). We may not reverse a trial judge's ruling if it was within the zone of reasonable disagreement. *Id.*

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). In this context, a statement includes "nonverbal conduct of

14

a person, if it is intended by the person as a substitute for verbal expression." *Id.* R. 801(a)(2). Hearsay is not admissible unless it is specifically permitted by the rules of evidence or statute. *Id.* R. 802.

Gauna insists that evidence concerning the process of investigating claims of sexual abuse was not relevant to the issue of whether Gauna committed sexual assault. The State argues that, because the defense questioned E.J.D.'s credibility, evidence of the safeguards employed in investigating claims of sexual abuse was relevant because it made the possibility that E.J.D. was lying less likely. Indeed, Gauna argued to the jury that E.J.D.'s many interviews with investigators and counselors caused her to fabricate her allegations against Gauna to placate those seeming authority figures. Evidence that those who interviewed E.J.D. were trained to ask open-ended, nonleading questions and not to push children for answers certainly made this theory less likely and was therefore relevant.

Next, Gauna contends that Stancik's and Cantu's testimony was more unfairly prejudicial than probative because it allowed the jury to infer that E.J.D. presented a consistent account of the sexual assaults to different people throughout the investigation. This testimony was likely prejudicial to Gauna. However, rule 403 only allows exclusion of relevant evidence where the probative value is outweighed by the danger of *unfair* prejudice. *Id.* R. 403. The danger of unfair prejudice exists when the evidence creates an undue tendency to suggest a decision on an improper basis such as an emotional one. *Erazo v. State*, 144 S.W.3d 487, 501–02 (Tex. Crim. App. 2004) (citing *Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999)). Here, the testimony of Stancik and Cantu, though it allowed an inference that E.J.D. told a consistent story, was not likely to inflame the emotions of the jurors nor to invite a decision on any other improper basis.

15

Gauna also argues that Stancik's and Cantu's testimony violated the hearsay prohibition because it allowed the jury to infer the contents of E.J.D.'s out-of-court statements. An out-of-court statement need not be directly quoted to run afoul of the hearsay rules. *Head v. State*, 4 S.W.3d 258, 261 (Tex. Crim. App. 1999). Whether the testimony violates the hearsay prohibition turns on how strongly the contents of the out-of-court statement can be inferred from the context. *Id.* "[T]he question is whether the strength of the inference produces an 'inescapable conclusion' that the evidence is being offered to prove the substance of an out-of-court statement." *Id.* at 262. Here, Stancik's and Cantu's testimony did not lead to an inescapable conclusion regarding what E.J.D. told them. Each merely testified that the investigation continued after her interview with E.J.D. A wide range of statements by E.J.D. could have caused the investigation to continue. Neither Stancik's nor Cantu's testimony allowed the jury to infer the details of what E.J.D. said out of court.

Gauna claims that Stancik's and Cantu's testimony also violated the hearsay prohibition by referring to E.J.D.'s nonverbal conduct that was intended as a substitute for verbal expression. *See* Tex. R. Evid. 801(a)(2). Stancik testified that E.J.D. seemed to be sad and depressed. Cantu testified that at the beginning of their interview, E.J.D. was open, talkative, and playful and that at one point her demeanor shifted and she became quiet and hesitant to talk and sucked on her fingers. Gauna has not hypothesized, nor can we imagine what verbal expression E.J.D.'s glum affect and shift in demeanor were intended as a substitute for.

For the reasons discussed above, we hold that the trial court did not abuse its discretion by admitting the testimony of Stancik and Cantu over Gauna's objections that it was irrelevant and more unfairly prejudicial than probative and that it violated the hearsay prohibition. We overrule Gauna's eighth and ninth issues.

**Testimony by Closed-Circuit Television**

In his tenth point of error, Gauna asserts that the trial court erred and violated his Sixth Amendment rights by allowing E.J.D. to testify through closed-circuit television. *See* U.S. Const. amend. VI.

The use of closed-circuit television testimony does not violate the Confrontation Clause if it is necessary to protect a child witness from significant emotional trauma caused by physical confrontation with the defendant in a courtroom. *Maryland v. Craig*, 497 U.S. 836, 855 (1990); *Marx v. State*, 987 S.W.2d 577, 580 (Tex. Crim. App. 1999). The trauma must be more than "mere nervousness or excitement or some reluctance to testify." *Craig*, 497 U.S. at 856. The trial court must find that the child witness would be traumatized by the presence of the defendant, not by the courtroom generally. *Id.* We review a trial court's decision to allow a child witness to testify by closed-circuit television for an abuse of discretion. *Marx*, 987 S.W.2d at 581 n.2.

At the hearing on whether to allow E.J.D. to testify through closed-circuit television, Antonia and Helen Williams testified. Antonia testified that E.J.D.'s problems with encopresis, enuresis, and "baby talk," which began after she was sexually assaulted by Gauna, improved with therapy but that E.J.D. regressed after being told that she would have to testify against Gauna in court. Antonia testified that after E.J.D. attended "court school," a program to familiarize children with the courtroom setting, she began spending nights in the bathroom with the light on. Antonia stated her opinion that E.J.D. would be traumatized if she had to be present with Gauna in the courtroom.

Williams similarly testified that E.J.D.'s behavioral issues had been improving through therapy but that their severity increased as Gauna's trial date approached and E.J.D. began preparing to testify against Gauna. Williams testified that she believed the use of closed-circuit

television was necessary to protect E.J.D.'s welfare and that E.J.D. would be traumatized if she had to face Gauna in the courtroom. Williams relayed E.J.D.'s statements that "she did not want to see Henry," "she was afraid of Henry," "she was really afraid that he would get out and come and get her; find her." Before she testified at trial, E.J.D. was questioned by Gauna's attorney. E.J.D. stated that it would scare her to testify in front of Gauna, that she would rather not do that, and that she did not think she could do it if she had to.

On these facts, we hold that the trial court did not abuse its discretion by finding that allowing E.J.D. to testify by closed-circuit television was necessary to protect E.J.D. from significant emotional trauma caused by physical confrontation with Gauna in the courtroom. We overrule Gauna's tenth issue.

## CONCLUSION

Having overruled all of Gauna's points of error, we affirm the trial court's judgment of conviction.

_____

David Puryear, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed:   December 29, 2006

Do Not Publish