

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. PD-1035-20

**VINCENT DEPAUL STREDIC, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE FOURTEENTH COURT OF APPEALS HARRIS COUNTY

KELLER, P.J., delivered the opinion of the Court in which HERVEY, RICHARDSON, NEWELL, KEEL and MCCLURE, JJ., joined. YEARY, J., filed a concurring opinion in which SLAUGHTER, J., joined. WALKER, J., filed a dissenting opinion.

In this murder prosecution, the jurors disagreed about certain testimony. By statute, testimony may be read back on a point on which the jurors disagree. But instead of merely reading back the testimony in question, the trial court gave the jury a written transcript of that testimony. The court of appeals concluded that the trial court erred in doing so and that Appellant was harmed by the error. We agree that the trial court erred in giving the jury a written transcript, but we

conclude that the error was harmless.[1] We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

## I. BACKGROUND

### A. The Incident

On November 10, 2016, Appellant drove around in his car with three friends— Christopher Barriere, Rodrick Harris, and another man. They stopped at a gas station. At some point after the gas had been pumped, Appellant opened the trunk of his car, retrieved a shotgun, and pointed it at Barriere. It is undisputed that the shotgun fired and that Barriere was shot and killed as a result.

What exactly happened during that sequence of events was disputed at trial. According to Harris, Appellant shot Barriere without any apparent provocation. Harris characterized Appellant's conduct as a "murder." Appellant testified that he caught Harris and Barriere smoking PCP and told them to get out of the car. He testified that they were resistant to this demand, so he pointed the shotgun at them just to scare them. Appellant claimed that he was scared of them because of the effects PCP could have on them. Appellant testified that he did not intend to shoot Barriere, did not intend to fire the shotgun, and did not even have his finger on the trigger. He said, "I don't know how it went off. I mean, been friends for a long time. That I did not -- I did not mean to shoot him or not try to shoot him. I didn't know why the gun went off." On redirect examination, he insisted

---

[1] We granted the State's two grounds for review:

1. The Fourteenth Court erred by holding a trial court cannot grant a jury's request for a transcript of disputed testimony.

2. The Fourteenth Court erred by conducting a harm analysis that did not consider the strength of the State's evidence, the weakness of the defense, or the lack of a logical connection between the supposed error and any legally determinative issue.

that the shooting was an accident.

After Barriere was shot, Harris jumped at Appellant. According to Harris, this was in reaction to the shooting, and he said to Appellant, "What is wrong with you." According to Appellant, Harris charged at him because he was under the effects of PCP. Appellant pointed the shotgun at Harris, and Harris ran to the front of the car. Appellant got into the driver's seat of the car and drove off.

Appellant later returned to the scene and shot Harris. According to Harris, the shooting occurred without provocation. According to Appellant, he shot Harris because Harris "came at" him. Appellant admitted that he shot Harris intentionally. He claimed that Harris was a big man, weighing 360 pounds or more, and he was afraid that Harris would hurt him. As a result of being shot, Harris suffered injuries to his face—from which he was still recovering at the time of trial.

Surveillance cameras caught most of the events on video, at two different angles. The events occurred at night, the events depicted are, for the most part, relatively far away, there is some blurring, some of the relevant events are obstructed or not caught on video, and there is no sound. Nevertheless, a significant amount of the encounter involving Appellant, Barriere, and Harris is depicted. The videos show the following events: Appellant's trunk is open. Appellant walks slowly from the driver's side door to the trunk. He then moves suddenly behind the trunk, Harris moves suddenly towards him, and Appellant points the shotgun at Harris. Harris then runs around the passenger side towards the front of Appellant's car. Appellant walks towards the driver's side of the car and points the shotgun at Harris. Harris then runs to the convenience store. Appellant then goes to the back of the car and closes the trunk. Harris stands outside the store, watching. Appellant gets in the car and drives slowly towards the store. He stops and opens the driver's side door. Harris

walks towards him. Appellant gets slowly out of the car and appears to be taking something out of it. He then turns around and moves toward Harris with shotgun in hand. Harris backs away. Appellant then raises the shotgun and continues to advance on Harris. Harris runs away from Appellant and back towards the store. Appellant then walks back to his car and drives away. Once Appellant drives away, Barriere's body can be seen lying on the ground. Harris walks back toward the spot where Barriere was shot and looks at Barriere's body. Appellant drives back up to the spot, gets out of the car, walks towards Harris and points the shotgun at him. Harris then runs back to the store. Appellant then gets back in the car and drives away again. Harris later walks back to the location of Barriere's body. Appellant's car returns a second time, and Harris can be seen running back to the store as the car backs away.

### B. Closing Arguments

The prosecutor briefly addressed a number of aspects of the charged offense that were essentially uncontested: e.g., that the defendant was the person who shot the victim, that the shooting caused the victim's death, and that the shooting was accomplished with a firearm. The prosecutor then focused on the mental-state element for murder and discussed it at length.

The prosecutor argued that Appellant acted within a short period of time and that his conduct appeared to be purposeful throughout the entire incident. The prosecutor contended that the incident did not involve an argument behind the trunk of the vehicle but involved "the defendant specifically going around behind the trunk of that vehicle with one purpose in mind." And the prosecutor argued that this was not a case of "Harris being aggressive or trying to come at him." The prosecutor emphasized that the jurors "get to watch the video" and that the jury already had. He also argued that the defendant had fled and that, when caught by the police, the defendant failed to explain that

the shooting was an accident because he had not figured out his story yet.

Defense counsel started closing argument by saying, "It was an accident. It was a horrible, horrible accident." Later, defense counsel said, "They're being aggressive with him, and he raises the shotgun. The shotgun goes off. It was an accident. He would never intentionally shoot one of his best friends."

In his rebuttal argument, the prosecutor stated, "People point guns at people all the time and guns don't just go off." He continued with this theme for some time and argued that Appellant pulled the trigger on purpose. The prosecutor also argued that the claim that the shooting was an accident was inconsistent with the claim that Barriere and Harris acted aggressively: "Is this a case of self-defense where the defendant had to do it and that's why he got his gun out, or is this a case of it's an accident?" The prosecutor argued that it was neither and that, "The defendant had no reason to raise that firearm but to shoot the complainant, and that's exactly what he did here." The prosecutor also pointed to the video as showing that Barriere was shot in the side of the head, meaning that Barriere was "not looking at the defendant when it happens" but was looking at a store and some girls passing by. Referring to the video, the prosecutor also said that "not once is Rodrick Harris coming at the defendant in any form of an aggressive manner." Later, the prosecutor argued that "it wasn't an accident" and "it wasn't self-defense" and told the jury, "You can see that from the videos." He also pointed to various actions on the video to support the conclusion that the shooting was intentional.

### B. The Jury Notes and Response

During deliberations, notes were sent back and forth between the jury and the trial court about the jury's request for Appellant's testimony about feeling threatened by Barriere or Harris.

The trial court told the jury that there had to be a disagreement about a statement of the witness before it could have the information.[2] Ultimately, the jury said that it was "in disagreement as to the statement of a witness," and asked, "Can we see the court reporter's notes when Vincent Stredic was the witness, when the State Attorney was questioning him, regarding his statement on if Vincent felt threatened by Christopher Barriere and Rodrick Harris?"

A transcript of the following testimony was submitted to the jury:

[Defense counsel] Q. Yeah. And so at some point we saw the video, right, the surveillance video - -

A. Yes.

Q. -- from the gas station? And looks like Christopher comes towards you. He takes a couple steps toward you. Is that what happened?

A. Yes.

Q. And then at that point, what did you do?

A. I raised the shotgun up just to scare him, just to back him up.

Q. Were you afraid at that point?

A. Yes.

Q. Why were you afraid?

A . Because, you know, I was assaulted with a bat and I can't see out of my eye . So I'm - - I'm already be paranoid, and then when I know the type of things that can happen when people get on that . So - -

Q. When they get on what?

A. PCP.

---

[2] The trial court originally told the jury that a disagreement was a predicate to having the testimony "reproduced" but later told the jury it was a predicate to having the "court reporter's notes read."

* * *

[Prosecutor] Q. You were standing by the trunk and they got out of the vehicle and came back to you. Is that what you're saying?

A. Yes.

Q. Okay. And you said that at that point Mr. Harris -- Mr. Rodrick Harris started saying something to the effect of you're not going to leave me here; is that right?

A. Yes.

Q. And you said at that point he also charged at you; is that right?

A. Yes.

Q. And you still had the shotgun in your hand at that point?

A. Yes.

Q. And you said that you raised the shotgun up and pointed it towards Mr. Harris; is that correct?

A. I just raised it up. I didn't point it really at nobody.

Q. Where did you point the gun?

A. I just just pointed it in the air.

* * *

[Defense counsel] Q. When Christopher Barriere was coming towards you just before that gun went off, were you scared?

A. Yes.

Q. Did you think he could seriously injure you or even kill you?

A. At a point, yes.

* * *

[Prosecutor] Q. Just to be clear, when Rodrick - - when the gun went off the first time, you said Rodrick Harris was walking to get back into the car, correct?

A. Yes.

Q. Okay. So he was not coming at you. He wasn't standing still. He's actually walking away from you; is that correct?

A. Yes.

Q. Okay.  So just to be clear, you're not saying you had to shoot the gun, you had no other choice. You're saying this was an accident; is that correct?"

A. Yes.

Q. Okay. So you weren't defending yourself with this firearm or anything like that. The gun just accidentally went off?

A. Yes.

\* \* \*

[Defense counsel] Q. Were you trying to defend yourself by just raising the gun and showing them the gun?

A. Yes.

The jurors also asked to see the surveillance video footage, and the trial court provided it to them.

### C. Jury Charge and Verdict

The jury charge included instructions on the charged offense of murder and the lesser-included offenses of manslaughter and criminally negligent homicide.  All three of these offenses required that Appellant caused Barriere's death.[3]  The distinction between the offenses was the culpable mental state Appellant had to have with respect to death.  For murder, Appellant had to act intentionally or knowingly,[4] while manslaughter and criminally negligent homicide required, respectively, culpable mental states of recklessness and criminal negligence.[5] Murder could also be

---

[3]  *See* TEX. PENAL CODE §§ 19.02(b)(1), (2), 19.04(a), 19.05(a).

[4]  *See id.* § 19.02(b)(1).

[5]  *See id.* at §§ 19.04(a), 19.05(a).

proven through a culpable mental state of intent to cause serious bodily injury accompanied by an act clearly dangerous to human life that caused death.[6] The jury charge did not include any instructions on self-defense. The jury convicted Appellant of murder.

### D. Appeal

The court of appeals originally affirmed the trial court's judgment but later granted rehearing and reversed the conviction.[7] The court held that Article 36.28 of the Code of Criminal Procedure allowed the oral readback of the court reporter's notes concerning disputed testimony but did not authorize giving the jury a written transcript.[8] The court further held that Appellant was harmed by the error under the standard for nonconstitutional errors.[9]

The court of appeals concluded that the crucial issue in the case was Appellant's mental state at the time of the shooting and that the jury's note showed that it was concerned about that issue.[10] The court believed that reading back the testimony would have properly struck a balance between the trial court commenting on the weight of the evidence and providing the jury with information needed to resolve a factual dispute but that providing transcripts tipped the balance in the State's favor.[11] The court found that to be especially the case because appellant's testimony "indicated he

---

[6] *See id.* at § 19.02(b)(2).

[7] *Stredic v. State*, 609 S.W.3d 257, 259 (Tex. App.—Houston [14th District] 2020) (op. on reh'g).

[8] *Id.* at 260.

[9] *Id.*

[10] *Id.*

[11] *Id.* at 263.

could not maintain a consistent story about what happened and what he felt during the incident, i.e., his culpable mental state."[12] The court further observed that "[w]ithout invading the role of the jury, we can never know for sure what influenced this jury in making its verdict, given the almost impenetrable wall surrounding deliberations."[13] The appellate court concluded that it was not convinced that the trial court's actions did not influence the jury or had but very slight effect.[14] Instead, the court harbored grave doubts about whether the error substantially influenced the jury's decision to find appellant guilty of murder instead of a lesser-included offense.[15]

In a supplemental opinion, the court of appeals addressed an argument by the State that Article 36.28 did not *prohibit* the trial court from submitting a transcript to the jury, and anything not specifically prohibited by the Code of Criminal Procedure was permitted.[16] The court of appeals held that, even if the State's view about the Code of Criminal Procedure was generally correct, "it would require an implausible reading of article 36.28 to apply it here."[17] The court observed that though the statute "does not spell out all of the potential ways the jury is not allowed to review the testimony of a witness, it is not difficult to connect the dots and conclude that procedures not authorized by the plain language of the article are prohibited."[18] The court of appeals concluded that

---

[12] *Id.* at 264.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 270 (supp. op. on reh'g).

[17] *Id.*

[18] *Id.*

"adopting the State's theory would render article 36.28 a nullity, a toothless provision merely containing two examples of ways in which testimony possibly might be provided to the jury, as opposed to delineating the only two ways the jury is permitted to receive it."[19]

## II. ANALYSIS

### A. Error

Article 36.28 provides:

> In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other;  but if there be no such reporter, or if his notes cannot be read to the jury, the court may cause such witness to be again brought upon the stand and the judge shall direct him to repeat his testimony as to the point in dispute, and no other, as nearly as he can in the language used on the trial.[20]

This statute authorizes testimony to be read back, or if that is not possible, bringing back the witness to repeat the testimony.  The statute does not purport to authorize submitting a transcript to the jury.

The State contends that the trial court still has discretion to submit transcripts to the jury because no statute *prohibits* such a practice.  Relying upon *Milton v. State*,[21] the State argues that a trial court need not have statutory authorization for its conduct during trial; as long as nothing prohibits the conduct, the trial court may act.  In *Milton*, this Court held that, within certain limitations, a trial court could permit the use of visual aids during closing arguments.[22]  The State argues that we allowed this practice despite the absence of any statute authorizing it.

---

[19] *Id.*

[20] TEX. CODE CRIM. PROC. art. 36.28.

[21] 572 S.W.3d 234 (Tex. Crim. App. 2019).

[22] *Id.* at 241-42.

We agree that a practice at trial is not necessarily prohibited simply because it is not authorized by statute. And it is not necessarily prohibited just because a statute that authorizes certain procedures does not authorize the procedure in question. In *Marx v. State*, we addressed whether Article 38.071, authorizing testimony by closed-circuit video in certain circumstances, prohibited testimony by closed-circuit video in circumstances not authorized by the statute.[23] In concluding that the statute did not prohibit other procedures, we quoted with approval from a concurring opinion by Judge Benavides in a prior case:

> [T]he only permissible interpretation of the statute, no matter how counterintuitive, is that it prescribes a specific alternative testimonial procedure under certain defined circumstances, leaving the courts free to develop different procedures under other circumstances, constrained only by constitutional prohibitions.[24]

We have also contrasted the limited and special jurisdiction that a trial court has after conviction with the "general jurisdiction" that a trial court has during trial.[25] Certain statutes expand a trial court's jurisdiction after conviction, "but only to the extent prescribed by the statute."[26] By implication, while the trial court has "general jurisdiction," it has authority to act even when not prescribed by statute.

But we conclude that Article 36.28 does prohibit the submission of transcripts to the jury. The statute says that the jury "may" have testimony read back under certain circumstances. This use

---

[23]   987 S.W.2d 577, 582 (Tex. Crim. App. 1999).

[24]   *Id.* at 582-83 (quoting *Gonzales v. State*, 818 S.W.2d 756, 768 (Tex. Crim. App. 1991) (Benavides, J., concurring)).

[25]   *See Ex parte White*, 506 S.W.3d 39, 51 (Tex. Crim. App. 2016) (discussing *State v. Patrick*, 86 S.W.3d 592 (Tex. Crim. App. 2002)).

[26]   *Id.*

of "may" here is not to confer discretion but to describe what is permitted.[27] That itself is not conclusive, but other aspects of the statute convince us that the statutory permission here excludes other procedures. The statute provides a precondition for reading back testimony—a jury dispute ("if the jury disagree"). Then it makes exclusive what testimony can be read—only the point in dispute ("that part of such witness testimony or the particular point in dispute, *and no other*") (emphasis added). Then it prescribes an exclusive alternative to reading back testimony—bring the witness to repeat the testimony if reading it back is not possible ("but if there be no such reporter, or if his notes cannot be read . . ."). All of these restrictions indicate that Article 36.28 provides the exclusive procedure for repeating earlier testimony to the jury.

If Article 36.28 were construed to not provide the exclusive procedure, then one could imagine the trial court causing testimony to be read back even when there is not a dispute, or submitting to the jury testimony that is not in dispute, or causing a witness to repeat testimony even when the court reporter's notes are available to be read back. No one would seriously contend that a trial court is permitted to do these things. Article 36.28 dictates *when* testimony can be repeated to the jury (if there is a dispute), *what* testimony can be repeated to the jury (the testimony in dispute), and *how* testimony can be repeated to a jury (by reading it back, or if that is not possible, by having the witness repeat the testimony). Submitting transcripts violates the "how" restriction in Article 36.28, and consequently, is not permitted.

With respect to jury instructions, we have said, "[e]ven a seemingly neutral instruction may constitute an impermissible comment on the weight of the evidence because such an instruction

---

[27] *See May*, BLACK'S LAW DICTIONARY (11th ed. 2019) (definition 1) ("To be permitted to").

singles out that particular piece of evidence for special attention."[28]  While reading back testimony

under Article 36.28 necessarily draws some special attention to evidence, the statute specifically

authorizes that procedure.  But supplying a transcript draws even more attention to such evidence,

and because it is not authorized by statute, it could potentially constitute an impermissible comment

on the weight of the evidence.[29]

## B. Harm

Because the error at issue is solely a statutory violation, the Rule 44.2(b) standard of harm

for nonconstitutional errors governs the analysis.[30]  Under that standard, an error that does not affect

---

[28]  *Bartlett v. State*, 270 S.W.3d 147, 152 (Tex. Crim. App. 2008).

[29]  *See* TEX. CODE CRIM. PROC. arts. 38.05, 36.14 (prohibiting comments on the weight of the evidence).  The concurring opinion relies on *Gandy v. State,* 97 Tex. Crim. 334, 336, 261 S.W. 145, 146 (1924), which allowed the court reporter's notes to be read when a witness could not be brought back to repeat testimony.  *Gandy* differs from the present case in at least two ways.  First, the statute in *Gandy* provided only a single method of repeating testimony, without outlining an alternative method.  *See id.* at 335, 261 S.W. at 145; TEX. CODE CRIM. PROC. art. 755 (1911).  The fact that the current statute includes an alternative makes it more obvious that the methods in the current statute are exclusive.  Second, the procedure in *Gandy* allowing the court reporter's notes to be read back did not risk emphasizing the testimony any more than bringing the witness back to repeat it.  But submitting a transcript to a jury does risk emphasizing the testimony more than having the court reporter's notes read back.

[30]  *See* TEX. R. APP. P. 44.2(b).  The dissent contends that the statutory error in this case is "structural" and, consequently, reversible without regard to harm.  But in *Cain v. State*, we held that only federal constitutional errors can be structural.  947 S.W.2d 262, 264 (Tex. Crim. App. 1997) ("Except for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis.").  We reaffirmed that principle just last year.  *Do v. State*, 634 S.W.3d 883, 896-97 (Tex. Crim. App. 2021) ("If an error is 'structural,' it is  exempt from a harm analysis.  But only federal constitutional errors can be structural, and most are not.").  Following *Cain*, we have also held that, "when only a statutory violation is claimed, the error must be treated as non-constitutional for the purpose of conducting a harm analysis, and that necessarily means the error cannot be deemed 'structural.'" *Gray v. State*, 159 S.W.3d 95, 98 (Tex. Crim. App. 2005).

substantial rights must be disregarded.[31]  An error affects substantial rights only if it has a substantial and injurious effect or influence in determining the jury's verdict.[32]  Put another way, an error does not affect substantial rights if an appellate court has fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect.[33]

In *Green v. State*, we addressed whether a defendant was harmed by a jury instruction that was an accurate statement of the law but was an impermissible comment on the weight of the evidence.[34]  There, the trial court included in the jury charge legally accurate definitions of "penetration" and "female sexual organ," but they should not have been included because they were not defined by statute.[35]  In the course of concluding that the error was harmless, we pointed out "[b]ecause penetration of the complainant's sexual organ was a critical element of the offense, the jury was already focused on the evidence pertaining to penetration."[36]  We also cited an earlier case that found an impermissible comment to be harmless because the advocates "focused the jury's attention quite competently on the disputed issue."[37]  We also pointed out that the instructions were "largely redundant of the information that was already before the jury" through witnesses and the

---

[31]  TEX. R. APP. P. 44.2(b).

[32]  *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018).

[33]  *Id.*

[34]  476 S.W.3d 440 (Tex. Crim. App. 2015).

[35]  *Id.* at 446-47.

[36]  *Id.* at 447.

[37]  *Id.* at 448.

State's argument.[38]

The case before us is not on all fours with *Green*, but the reasoning from that case is relevant here. As the court of appeals observed, the potential harm from submitting transcripts to the jury is the harm that would flow from a comment on the weight of the evidence. To some degree, the mere repetition of testimony to the jury results in emphasizing the evidence—even if that testimony is merely read back. Submitting a transcript increases the emphasis, but we are not comparing a trial in which testimony was emphasized to a hypothetical trial in which it was not. Instead, we are comparing the relative emphasis of providing a transcript versus reading testimony back to the jury, and we are assessing whether the additional emphasis resulted in harm.

The only contested issue at trial was Appellant's mental state. Was the shooting an accident or was it intentional? Part of the State's argument that the shooting was intentional was that Appellant's statements lacked credibility. The State's position was that there was no argument between Appellant and the two men who were shot and that the two men did not act aggressively toward Appellant. The State argued that guns do not just fire on their own and that the video contradicted Appellant's version of events. The State also claimed that Appellant's statement that he was in fear conflicted with his statement that the shooting was an accident.

If some of the jurors were confused about whether Appellant claimed in his testimony to have felt threatened by Barriere and Harris, a read-back of the testimony would have cleared that up. Even if the jurors would not have remembered the specifics of the testimony without a transcript, it would have surely taken from a read-back the answer to its question—that Appellant claimed to have felt threatened by the two men. If Appellant's mere claim that he felt threatened ruined his credibility

---

[38] *Id.*

regarding whether the shooting was an accident, then reading back the testimony would have accomplished that. We see nothing about the jurors having the transcript that would have placed Appellant in a worse position in that regard.

If, on the other hand, the jurors were concerned with whether there was an inconsistency regarding the specifics of Appellant's claims, having the transcript actually benefitted Appellant. We disagree with the court of appeals's conclusion that Appellant's story was inconsistent. Appellant claimed that Barriere and Harris acted aggressively towards him, that their aggressive actions made him feel threatened, that he pointed his shotgun at them as a result, that pointing the shotgun was intended only to scare them, and that the shotgun went off accidentally. This story was completely consistent. With the transcript in hand, the jury could carefully review his testimony and ascertain that Appellant's story was in fact consistent.

Having the transcript also benefitted Appellant by providing the jury with a memorialization of his story. The jury requested and received the surveillance video, which it could play over and over again. The State emphasized the surveillance video in closing arguments while defense counsel never argued that the surveillance video footage supported the defense theory of the case. The video did not capture what was said between Appellant and the other two men, what happened between Appellant and Barriere is obscured by the open trunk, and Harris does move suddenly toward Appellant after Barriere is shot. But on the videos, Appellant appears to act deliberately in approaching and shooting Barriere, and the videos show Appellant acting aggressively several times in advancing on Harris while pointing the shotgun. And Appellant's return to the scene and shooting Harris strongly suggests Appellant was the aggressor during the entire incident. The transcripts served as a counterpoint to the video in the jury room by giving the jury an exculpatory version of

the story that the jury could review over and over.

Appellant contends that he was harmed because the transcript indicated that Barriere was walking away from him when the gun was discharged. He claims that this evidence tended to show that he was not in fear at the time of the gun's discharge. He further claims that this strengthened the State's case. Appellant is mistaken about what the submitted portions of the transcript indicated. According to the transcript, Barriere was approaching Appellant when the shotgun fired the first time, hitting Barriere. It was *Harris* who was backing away. Appellant also testified consistently in the transcript excerpts that Harris was advancing on him when he shot Harris. Again, having the transcript potentially benefitted Appellant. Had the testimony merely been read back, perhaps the jury could have forgotten whether Appellant's testimony had Barriere or Harris backing away when Appellant shot Barriere. But with the transcripts in hand, the jury would have realized that Appellant claimed only that Harris was backing away when Barriere was shot.

Under the circumstances, we have a fair assurance that submission of the transcript, as opposed to merely reading back the testimony, did not influence the jury, or had but a slight effect. We therefore conclude that the error was harmless under the standard for nonconstitutional errors. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

Delivered: May 11, 2022

Publish